IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

IN RE:                                        )
                                              )
COX ENTERPRISES, INC., SET-TOP   )          09-ML-02048-C
CABLE TELEVISION BOX                  )
ANTITRUST LITIGATION                 )

### FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

The Plaintiffs and Class Representatives bring this Amended Consolidated Class

Action Complaint against Cox Enterprises, Inc. and Cox Communications, Inc.

(collectively "Cox"), and allege the following:

### INTRODUCTION

1.      This is a class action brought on behalf of all persons who have purchased

Premium Cable, as defined herein, from Cox and who have been compelled to rent a set-

top box distributed by Cox.  Premium Cable subscribers cannot view or access all of the

services to which they subscribe without a set-top box, which connects to, and is

essentially an extension of, a television set.  Cox abuses its substantial economic power in

the market for Premium Cable by forcing subscribers, as a condition of purchasing its

Premium Cable services, to rent the set-top boxes that it distributes.

2.      That conduct enables Cox to severely constrain competition in the market

for the sale or lease of set-top boxes and to extract supra-competitive profits from Class

Members.  Cox's conduct has had and continues to have substantial adverse effects upon

interstate commerce and has caused and continues to cause direct economic injury to

Class Members.

3.     As set forth below, Cox has tied the distribution of set-top boxes to the provision of Premium Cable and has thereby unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## THE PARTIES

4.     Plaintiff Ernest Johnson is a citizen of the State of Oklahoma who resides in the City of Claremore, Rogers County.  At all material times, Plaintiff Johnson has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

5.     Plaintiff Bradley Gelder is a citizen of the State of Arizona who resides in Tempe, Arizona.  At all material times, Plaintiff Gelder has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

6.     Plaintiffs John Joseph Brady and Elizabeth Ann Brady are citizens of the State of California who reside in San Diego, California.  At all material times, Plaintiffs John Brady and Elizabeth Brady have subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

7.     Plaintiff Sharon Coughlin is a citizen of the State of California who resides in the County of San Diego.  At all material times, Plaintiff Coughlin has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

8.     Plaintiff Ron Strobo is a citizen of the State of Florida who resides in Pensacola, Escambia County, Florida.  At all material times, Plaintiff Strobo has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

9.     Plaintiff Henry Holmes is a citizen of the State of Louisiana who resides in New Orleans, Louisiana.  At all material times, Plaintiff Holmes has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

10.     Plaintiff Jessica Diket is a citizen of the State of Louisiana who resides in New Orleans, Louisiana.  At all material times, Plaintiff Diket has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

11.     Plaintiff Barksdale Hortenstine is a citizen of the State of Louisiana who resides in New Orleans, Louisiana.  At all material times, Plaintiff Hortenstine has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

12.     Plaintiff Danielle Smith is a citizen of the State of Louisiana who resides in Metairie, Louisiana in the Parish of Jefferson.  At all material times, Plaintiff Smith has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

13.     Plaintiff David Abdullah is a citizen of the State of Louisiana who resides in New Orleans, Louisiana.  At all material times, Plaintiff Abdullah has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

14.     Plaintiff Trevor Haynes is a citizen of the State of Louisiana who resides in the City of New Orleans, Parish of Orleans.  At all material times, Plaintiff Haynes has been a subscriber to premium cable services with Defendants and rented a set-top box from Cox.

15.     Plaintiff Michael Helmstetter, Jr. is a citizen of the State of Louisiana who resides in the City of Terrytown, Parish of Jefferson.  At all material times, Plaintiff Helmstetter has subscribed to Premium Cable provided by Cox and rented a set-top box from Cox.

16.     Plaintiff Sandra Prezgay is a citizen of the State of Nevada who resides in Las Vegas, Nevada, in the County of Clark.  At all material times, Plaintiff Prezgay has

subscribed to Premium Cable provided by Cox and rented a set-top box from Cox and rented a set-top box from Cox.

17.     Defendant Cox Enterprises, Inc., is a Delaware corporation with its principal place of business in Atlanta, Georgia.

18.     Defendant Cox Communications, Inc., a Delaware corporation with its principle place of business in Atlanta, Georgia.

19.     Among other communications endeavors, Cox provides multi-channel video programming distribution through a cable network and leases set-top boxes.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, in that Plaintiffs, on their own behalf and on behalf of the Class, assert claims under the Sherman Act, 15 U.S.C. § 1.

21.     Venue is proper in this Court under 15 U.S.C. § 22 because Cox may be found here and transacts business here.

## FACTUAL ALLEGATIONS

22.     Cox is one of the five largest providers of cable multi-channel video programming distribution ("MVPD") in the United States.

23.     Cable MVPD providers tend not to compete with one another and face little, if any, competition from MVPD providers who use another format besides cable. Accordingly, Cox has substantial economic powers in the areas in which it operates.

24.     Cox, through the conduct described herein, abuses its economic power over cable MVPD and commits a classic tying violation.  More specifically, it compels consumers who purchase its Premium Cable services to also rent a separate product that it

4

distributes. That separate product, a set-top box, is essentially an extension of a television set, which consumers must use to access the full range of Premium Cable services that they have purchased. The monthly rental fee that Cox forces consumers to pay for set-top boxes quickly adds up to more than the cost that Cox pays to purchase set-top boxes from their manufacturers.

<u>The Tying Product: Premium Cable</u>

25.     Cox, like other cable MVPD providers, offers two cable products, Basic Cable and Premium Cable.

26.     Basic Cable consists of a relatively small number of networks or channels, including local channels. For that service, Cox charges a monthly fee that varies slightly from one location to another.

27.     Premium Cable is a higher quality, more extensive and more user-friendly product than Basic Cable. It includes an interactive programming guide, which enables subscribers to quickly navigate through their substantial array of channels and determine when and where particular programs will appear; pay-per-view, which allows subscribers to purchase special programs like live sporting events that are not otherwise broadcast; on-demand, which allows subscribers to watch certain programs whenever they choose simply by pushing a button; high-definition channels, which present programs in a crisper, more life-like format than their standard counterparts; a range of premium and specialty channels such as the History Channel and various sports channels; and a range of channels that subscribers can pay to receive such as HBO.

28.     Premium Cable is a uniquely desirable product because it allows consumers, without leaving the comfort of their home and without resorting to multiple

systems, to efficiently sift through a wide number of programs and find one that suits their interest at any given moment.  As discussed in further detail below, at least twenty percent, and likely more, of Cox's cable customers subscribe to Premium Cable.  That is true for the other leading cable MVPD providers as well.

29.     Customers who subscribe to Premium Cable must also subscribe to Basic Cable.  They pay a significant additional monthly fee for Premium Cable, which also varies somewhat depending on what services they purchase and where they live.  When subscribers access their pay-per-view service and order a particular pay-per-view program they pay another fee.

30.     A testament to Premium Cable's popularity, the Federal Communications Commission's ("FCC") Thirteenth Annual Report ("the Report") on video programming, released this year, indicates that in 2005, there were almost 97 million Premium Cable subscriptions in the United States.

31.     The popularity of Premium Cable is shaping the entire cable MVPD industry and, as the Report notes, is one of the major factors behind the industry's projected growth to $72.9 billion in 2006, up 11.1 percent from 2005.

32.     As described in further detail below, Premium Cable subscribers cannot access Premium Cable by simply plugging Cox's MVPD cable into a television.  Instead, they need an additional product to interface between the MVPD cable and a television. In contrast, Basic Cable subscribers can access Basic Cable by plugging the MVPD cable into most modern televisions, which are "cable-ready."

33.    A digital receiver or digital converter, which is commonly referred to as a set-top box, is the only product that provides an interface between an MVPD cable and a televisions and that allows customers to access all Premium Cable services.

34.    As defined herein, Premium Cable means cable video services that subscribers cannot access merely by plugging an MVPD cable into a cable-ready television.  That definition includes all of the services described above.

35.    Premium Cable is the tying product.

The Tied Product: Set-Top Boxes

36.    A set-top box is essentially an extension of a television set that enables consumers to use and view Premium Cable.

37.    Most televisions sold in the United States during the last decade are capable of receiving certain programs transmitted through a cable MVPD system.  As a matter of pure technical capacity, such "cable-ready" televisions would allow consumers to access most premium channels available on Premium Cable.

38.    Cable-ready televisions cannot, however, access the interactive programming guide, pay-per-view, or on-demand services that give Premium Cable much of its value.  To access those services, consumers need the ability not just to receive signals from a cable MVPD system, but also to communicate with the cable MVPD system and transmit a particular selection from a range of options.  It is precisely those services that allow subscribers to personalize their programming choices and that give Premium Cable much of its value and define its unique product nature.

39.    A set-top box is the only product that has the required two-way communication capability that allows consumers to access the full range of Premium

Cable services.  Premium Cable subscribers must therefore have set-top boxes to access their interactive programming guide, pay-per view and on-demand services.

40.     Consumer electronics companies, such as Motorola and Scientific Atlantic, manufacture set-top boxes.

41.     Consumers have demonstrated a demand for acquiring set-top boxes apart from Premium Cable.  In response, such retail vendors as www.newelectronix.com sell set-top boxes for approximately $110.

42.     As described in greater detail below, Cox forces consumers who purchase Premium Cable to rent set-top boxes from Cox for a monthly fee.  That fee is in addition to the fee subscribers pay for their Premium Cable services and is clearly marked on their bill as a fee for set-top boxes.

43.     Cox's practice of tying set-top boxes to Premium Cable forecloses most of the competition in the market for set-top boxes.

44.     Set-top boxes are the tied product.

Consumers Who Purchase Premium Cable From Cox Are Also Forced To Rent Set-Top Boxes From Cox

45.     Cox forces consumers who purchase its Premium Cable service to rent the set-top boxes that it distributes.

46.     The Report notes that this practice is common throughout the cable MVPD industry.

47.     Cox makes the tying requirement clear on its website, where it states, "In order to receive interactive TV services offered by Cox, such as the Interactive Programming Guide (IPG), On DEMAND or Pay-Per-View, you must rent a digital receiver      [a      set-top      box]."      Cox      website,

http://ww2.cox.com/residential/neworleans/tv/digital-cable.cox    (last visited July 30, 2009). That language is repeated in slight variations throughout the website. For example, the website also states that for each of its Premium Cable packages, "Digital Receiver rental [SIC] required." Cox website, www2.cox.com/residential/neworleans/tv/pricing.cox (last visited July 30, 2009).

48.    When Premium Cable subscribers contact Cox regarding set-top boxes, Cox's representatives reinforce the requirement that the subscribers must rent set-top boxes from Cox. More specifically, Cox's representatives state: (1) that if subscribers do not have a set-top box, they will not be able to access the interactive programming guide, on Demand, or pay-per-view services, (2) that subscribers cannot purchase a set-top box from Cox, and (3) that if subscribers obtain a set-top box from any source other than Cox, it will not work on Cox's cable MVPD system. (Exhibit A, Affidavit of Plaintiff Jessica Diket).

49.    That set-top boxes obtained from a source other than Cox will not function on Cox's cable MVPD system is another means of requiring consumers to submit to its illegal tie. The reason those set-top boxes do not function on Cox's cable MVPD system is not because they lack a critical technology over which Cox has sole control, as all set-top boxes utilize the same basic technology and components. Rather, Cox either instructs its cable MVPD system not to acknowledge those set-top boxes or its cable MVPD system uses a specific software and Cox refuses to download that software onto set-top boxes that it does not distribute.

50. The monthly rental fee that Cox charges consumers for set-top boxes quickly adds up to more than the price that Cox paid to purchase the set-top boxes in the first place.

51. Cox purchases set-top boxes from several consumer electronics manufacturers at a price that can only be determined through discovery. However, it is estimated that the useful life of set-top boxes runs from three to five years. Even if Cox purchases set-top boxes for $110, which is the price at which retail consumers can purchase a single set-top box from www.newelectronix.com, Cox's monthly rental fee of at least $5.25 will surpass $110 in less than two years, leaving Cox with a minimum of one year of pure profits and consumers with a substantial loss. Upon information and belief, Cox purchases its set-top boxes in bulk at much lower costs than the cost to retail consumer.

52. Congress indicated in Section 629 of the Communications Act that it expects consumers to have choice in their selection of set-top boxes. 47 U.S.C. § 549. The FCC has interpreted Section 629 as prohibiting cable MVPD providers from taking advantage of their security concerns to require consumers to use the set-top boxes that they distribute.

53. Although cable-ready televisions have the technological capacity to receive certain Premium Cable services, cable MVPD providers, including Cox, encrypt or scramble the data they transmit through their cable MVPD systems. This security practice prevents consumers from receiving Premium Cable services to which they do not subscribe. Cable MVPD providers do not employ this security measure for Basic Cable,

which means that consumers can access and view Basic Cable with a cable-ready television.

54.     Presently, consumers need a special device to descramble or unencrypt Premium Cable.  Consumers who do not have such a device will not be able to access or view the Premium Cable services to which they subscribe.

55.     There is no valid reason technologically or otherwise to bundle the device that performs this security function with the digital conversion and two-way communication functions of set-top boxes or to stifle innovation into new technologies by a competitive market.  Nevertheless, cable MVPD providers, including Cox, have done just that and have successfully taken steps to ensure that most consumers do not receive the security device separate from a set-top box.

56.     In response, the FCC prohibited cable MVPD providers from requiring consumers to use security devices that are integrated with set-top boxes.  This prohibition, sometimes referred to as the "integration ban," recognizes that when cable providers succeed in creating an environment in which consumers must use the set-top boxes that they distribute, competition in the set-top box market will be drastically reduced.  It also implicitly recognizes that cable providers have economic power in markets related to the provision of cable MVPD.

57.     Cox has, at best, made minimal efforts to comply with the integration ban. It nominally offers a device known as a CableCARD, which can perform the required security function and which can be plugged directly into certain cable-ready televisions and, in theory, into certain non-integrated set-top boxes.

58.     CableCARDs are by definition not substitutes for set-top boxes, for they do not perform two-way communication and thus do not allow Premium Cable subscribers to access valuable Premium Cable services that they have purchased. Cox is quick to acknowledges as much on its website, where it states:

> The current first generation of CableCARD technology is "one-way," meaning the service cannot support two-way interactivity. As a result of this one-way communication, you will not have access to the Interactive Program Guide, On Demand or impulse Pay-per-view movies.

Cox website, https//www.cox.com/Louisiana/digitalcable/cablecard.asp (last visited July 30, 2009).

59.     Cox has taken additional measures to limit the availability and attractiveness of CableCARDs. For example, the FCC recently found that Cox changed the signal of certain popular channels to a format, "Switched Digital Video," that CableCARDs could not receive in order to make set-top boxes, which can receive that format, more attractive. *In the Matter of Cox Communications, Inc., Fairfax County, Virginia Cable System*, File No. EB-07-SE-351 (Oct. 15, 2008).

60.     Among other things, Cox also requires Premium Cable subscribers to rent the CableCARDs that it distributes and charges them an installation fee. That charge is particularly egregious, as the installation simply consists of inserting a CableCARD into an open slot in a cable-ready television.

61.     Most significantly, Cox has distributed a strikingly small number of CableCARDs. According to the National Cable and Telecommunications Association's filings with the FCC, at the end of May 2009, Cox had less than 40,000 CableCARDs in service. By comparison, Cox has millions of set-top boxes in service.

62.    Cox's conduct, along with similar tactics from other cable MVPD providers, led the Consumer Electronics Association to raise an objection with the FCC in December of 2006 detailing how cable MVPD providers were preventing consumer electronics manufacturers from selling unintegrated set-top boxes to consumers.

63.    In essence, Cox is doing everything in its power to protect its illegal tie of Premium Cable to set-top boxes.

<u>Cox Possesses Economic Power In The Tying Market</u>

64.    As numerous statistics demonstrate, Cox has the requisite economic power to force consumers to submit to its illegal tying practice.

65.    Those statistics include direct evidence of Cox's consistently rising price for Premium Cable and corresponding evidence of Cox's substantial market share.

*Cox Regularly Increases The Price Of Premium Cable*

66.    The average cable MVPD prices have increased over 90%, more than three times the rate of inflation, during the last ten years.  That is not surprising, for, as discussed in greater detail below, cable MVPD providers operate in virtual monopolies, typically isolated from one and other and largely free from any other competition.

67.    Likewise, the Report found that another major factor in the projected growth of the cable MVPD industry to $72.9 billion in 2006 is rising cable MVPD prices.

68.    One of the largest cable MVPD providers in the country, Cox has repeatedly raised the price of Premium Cable over the last ten years.

69.    Cox's ability to raise the price of Premium Cable demonstrates that it has sufficient economic power to unlawfully tie set-top boxes to Premium Cable.

*Cox Has A Substantial Share Of The Relevant Market*

70.     The relevant product is the provision of Premium Cable MVPD.

71.     The Report found that the demand for Premium Cable's unique and high-quality service has consistently grown since the product's inception.

72.     Cox's most recent 325 Filings, which are from 2006 and cover most of the areas in which Cox provides cable MVPD, comport with that finding and indicate high demand for its Premium Cable.  The filings indicate that Cox distributed almost 3.9 million set-top boxes, which are only rented to Premium Cable subscribers, among approximately 4.6 million customers.  Although some Premium Cable subscribers likely rent more than one set-top box, even if each Premium Cable subscriber rented four set-top boxes, which is a considerable overstatement, over 20 percent of Cox's customers would subscribe to Premium Cable.  The actual percentage is undoubtedly higher.

73.     Cable MVPD, which consists of Premium Cable and Basic Cable, is the dominant form of MVPD.  According to a 2007 Congressional research report, Cable MVPD makes up 69% of all MVPD in the United States.

74.     The remaining MVPD is primarily transmitted by satellite.  Satellite MVPD, however, is not reasonably interchangeable with cable MVPD.  Studies have found that MVPD users exhibit low rates of switching between cable and satellite.  That is especially significant given that, in consumer surveys, satellite users express high levels of satisfaction with their service, while less than fifty percent of cable users express satisfaction with their service.

75.     Along with other important distinctions, significant technological differences between cable MVPD and satellite MVPD largely explain why consumers do not consider the two products reasonably interchangeable.

76.    The infrastructure supporting cable MVPD and the infrastructure supporting satellite MVPD function optimally in different settings.  Cable MVPD tends to operate best in more densely populated areas where its network of wires can reach large numbers of people and justify the high cost of building the network.  By contrast, satellite MVPD tends to operate best in rural areas, where there is more space to place dishes, fewer buildings such as condominiums that prohibit dishes, and more clear sight lines for dishes to access the sky.  Indeed, as the Report found, the technological requirements for satellite MVPD mean that satellite MVPD penetration even varies within specific communities.

77.    The equipment that consumers need to access cable MVPD is distinct from the equipment that they need to access satellite MVPD.  Significantly, replacing cable MVPD with satellite MVPD entails switching costs, in terms of the time required to install the new equipment, during which consumers may not have any MVPD service, the cost of new equipment and other factors.

78.    Cox also maintains that satellite MVPD is not reasonably interchangeable with cable MVPD.  Taking advantage of its unique relationship with its expansive customer base, Cox states on its website that the signal on satellite MVPD is subject to disruption from such common circumstances as rain and wind.  Cox website, http://ww2.cox.com/residential/neworleans/tv/satellite-myths.com (last visited July 30, 2009).

79.    Moreover, as the Report notes, cable MVPD providers offer premium services not offered by satellite, and the number of consumers who subscribe to Premium

Cable continues to grow.  Satellite MVPD providers also do not always carry local channels.

80.    The Report offers further evidence that satellite MVPD is not a reasonable substitute for cable MVPD.  It found that in the few areas where more than one cable MVPD provider operate, the price of cable services has declined by as much as 20%, but in the areas where a single cable MVPD operates, the availability of satellite MVPD has completely failed to restrain cable MVPD providers from rising significantly.

81.    While other forms of MVPD besides cable and satellite exist, the Report found that they serve small numbers of subscribers in limited areas.

82.    Most of those other forms of MVPD transmit data over a "wireline" system.  Wireline systems include, among other thing, cable providers and fiber optic telephone lines.  Wireline challengers to an incumbent cable MVPD provider are commonly referred to as "overbuilders."

83.    Potential challengers to an incumbent cable MVPD provider that transmit data through a wireline system, be it cable MVPD or another form of MVPD, face significant entry barriers.  Indeed, the Report found that relatively few consumers have a second wireline alternative, whether cable MVPD or another form of MVPD.

84.    The first and most basic barrier to entry is the huge cost of building a wireline MVPD system.  According to the Report, cable MVPD providers have invested over $100 billion to construct advanced two-ay fiber optic networks.  It is estimated that they spent $10.6 billion on capital improvements in 2005 and $11.1 billion in 2006.  These advances allow cable MVPD providers to offer Premium Cable.  An MVPD

provider whose infrastructure does not allow it to offer premium services simply cannot compete with an incumbent cable MVPD provider.

85.     Moreover, whereas incumbent MVPD providers faced virtually no competition when they were building their infrastructure and have been able to self-finance advanced infrastructure projects with high prices, challengers will have to charge lower, competitive prices and seek outside financing to acquire the necessary infrastructure.

86.     Not surprisingly, potential challengers claim that incumbent cable MVPD providers engage in predatory pricing to drive the challengers' revenues down to levels where they cannot recoup the costs of constructing their infrastructure.

87.     Incumbent cable MVPD providers thus have a classic first mover advantage and are in a unique position to maintain, and take advantage of, the necessary economies of scale and scope.

88.     Second, the FCC found that the franchising process in many localities is a barrier to entry.  Local franchising authorities often impose "build-out" requirements mandating that a new entrant overbuild all of the geographic area served by the incumbent cable MVPD provider.  They also commonly impose "level playing field" regulations requiring a new entrant to match all of the concessions provided by the incumbent cable MVPD provider.  Such requirements create major risks for potential challengers, as they force challengers to incur costs even when they are not justified by prevailing market conditions.  In addition, the FCC found evidence of regulatory capture of the local franchising authorities by incumbent cable MVPD providers, including unreasonable delays in determining whether to grant challengers franchises and

demanding in-kind payments from challengers. As a consequence, the FCC recently promulgated rules intended to limit the negative effects of local franchising authorities.

89.     A third entry barrier is that incumbent cable MVPD providers offer valuable programming to which challengers do not have access. Incumbent cable MVPD providers often have exclusive contracts with key content providers who control the programming that is most important to consumers, such as regional sports networks. In addition, incumbent cable MVPD providers own or control a number of popular content providers, and, under certain circumstances, are permitted to refuse to provide potential challengers with that content or to provide them with that content on discriminatory terms. This further limits potential challengers' ability to offer competitive products.

90.     Special circumstances surrounding multiple dwelling units ("MDUs"), such as apartment buildings and cooperatives, form a fourth entry barrier. Incumbent cable MVPD providers often have long-term contracts, with automatic renewal privileges, to serve as the exclusive MVPD provider for MDUs. With thirty to thirty-five percent of the country's population living in MDUs, that means that incumbent cable providers have already locked up a significant segment of potential consumers. Furthermore, these exclusive contracts magnify the impediments created by build-out requirements, which would require potential challengers to pay to extend their wireline systems to countless MDUs where they have little hope of obtaining customers.

91.     Thus, even assuming that other forms of wireline MVPD are substitutes for cable MVPD, the many substantial entry barriers have kept their market share so low that they lack the power to constrain cable MVPD providers.

92.     As for potential cable MVPD challengers, the Report found that, due to these entry barriers, they cannot reasonably expect to capture more than a fraction of the incumbent cable MVPD provider's business.

93.     Similarly, the Report stated that the entry barriers have led incumbent cable MVPD providers to "cluster" their systems in different areas rather than directly compete against each other.

94.     In Cox Communications' 2005 10-K Annual Report, Cox notes that it has pursued this "[c]lustering" strategy.

95.     Even more significantly, the 2005 10-K Annual Report acknowledges that:

> the number of competing cable systems in Cox's service areas has been relatively slight, and fewer than 8% of Cox's total homes passed are overbuilt by other cable operators at this time . . . Cox believes that the current level of overbuilding has not had a material impact on its operations . . . .

96.     Thus there is no product that is reasonably interchangeable with cable MVPD that has any appreciable market share or that threatens the economic power of incumbent cable MVPD providers.

97.     Market data further highlights the strength of these entry barriers and the dearth of competition for incumbent cable MVPD providers.  For example, Cox's "325 Filings" from 2006, which cover almost all of the areas in which Cox operates, indicate that it provides cable MVPD services to fifty-nine percent of the potential customers that its cable MVPD system reaches, and in no area does it provide service to less than forty-six percent of those potential customers.  Cox's 325 filings from earlier years for the remaining areas in which it operates list similar numbers.  In addition, Cox's share of the relevant market is actually higher than the 325 Filings indicate, because many potential

subscribers who do not subscribe to Cox do not receive MVPD service from any other provider.

98.    The foregoing makes clear that Cox has sufficient economic power in all of the areas in which it operates to enforce its illegal tying scheme.

99.    Indeed, Cox has such a staggering share of the potential subscribers in the areas in which it operates that even if satellite MVPD was considered part of the relevant market, Cox would still have sufficient economic power to enforce its illegal tie.

100.   Cox's economic power over the provision of cable MVPD translates into power over both Basic Cable and Premium Cable.  That is because the two products are distributed over the same cable MVPD network.

101.   Additional market data information, which is only available through discovery, will provide greater detail of Cox's economic power.

102.   The relevant geographic market is the areas in which Cox provides Premium Cable.

103.   Those areas are certain communities in: Arizona, Arkansas, California, Connecticut, Florida, Georgia, Iowa, Idaho, Kansas, Louisiana, Nebraska, Nevada, Ohio, Oklahoma, Rhode Island, and Virginia.

104.   As Cox's 325 Filings indicate, in each of those communities, Cox has sufficient market power to impose the unlawful tie.

105.   Cox also applies uniform policies throughout the areas in which it operates.  In Cox's own words:

> The fact is that while the alleged practices at issue involving the sale of premium video services, the leasing of set-top boxes, and the provision of cable cards occur at Cox's various cable systems, these practices derive by and large from business decisions that are

overseen by various corporate departments at Cox's corporate headquarters in Atlanta.

(Reply to Plaintiffs' Responses to Pending Motions to Transfer Related Antitrust Actions to the Middle District of Georgia for Consolidated Pretrial Proceedings, at 7).

106.    Cox possesses the requisite economic power to impose a tie and imposes the same relevant policies in all of the areas in which it operates.  Accordingly, those areas form one geographic market for the purposes of this matter.

107.    In the alternative, each of the local areas in which Cox operates is a relevant geographic market.

Cox's Illegal Tie Affects A Not Insubstantial Amount Of Commerce In The Market For Set-Top Boxes

108.    Only Premium Cable subscribers will seek to acquire set-top boxes.

109.    Consumers seeking set-top boxes can purchase them from retailers such as www.newelectronix.com for approximately $110.

110.    Given the efforts of Cox and the other cable MVPD providers to control the provision of set-top boxes through the illegal tie, the fact that set-top boxes are being sold at all shows the eagerness of consumers to secure set-top boxes in an open market.

111.    Consumer electronics manufacturers have noted that eagerness and objected to the FCC regarding the conduct of cable providers that restricts their ability to sell unintegrated set-top boxes to Premium Cable subscribers.

112.    The fact that Premium Cable subscribers have, for the most part, succumbed to cable MVPD providers' inflated pricing of set-top boxes offers additional incentive to consumer electronics manufacturers, for it shows the high value that consumers place on Premium Cable and set-top boxes.  Indeed, with their history of

entering a wide range of markets and offering innovative, attractive, and successful products, the prospect for consumer electronics manufacturers to sell unintegrated set-top boxes to Premium Cable subscribers should be great.

113.    If not for Cox's and the other cable MVPD providers' illegal tying practices, substantially more set-top boxes would be sold on the open market than is presently the case.

### Cox's Illegal Tie Affects A Not Insubstantial Amount Of Interstate Commerce

114.    Cox provides cable MVPD to millions of customers throughout the United States.

115.    Many of those customers subscribe to Cox's Premium Cable services and almost every member of that group rents set-top boxes from Cox, which Cox purchases from consumer electronics manufacturers in different parts of the country.

116.    The exact amount of money Cox generates from renting set-top boxes can only be determined through discovery, but it is certainly not insubstantial.

## CLASS ACTION ALLEGATIONS

117.    Pursuant to Fed. R. Civ. P. 23(b)(1), (2) and (3), Plaintiffs bring this action on behalf of themselves and all others similarly situated as members of the proposed Class.  That Class is defined as follows:

> All persons in the United States who subscribed to Cox for Premium Cable and paid Cox a monthly rental fee for an accompanying set-top box.
>
> Excluded from the Class are those Cox customers who receive cable MVPD service from Cox at an address at which they may receive MVPD service from at least one other cable MVPD provider in addition to Cox; however, this exclusion shall only apply as of the date such competing service became available and

does not defeat such class members' right to a remedy for injuries suffered prior to the existence of such competition.

Excluded from the Class are Cox officers, directors or employees, any entity in which Cox has a controlling interest, the affiliates, legal representatives, attorneys, heirs or assigns of Cox, and any federal, state, or local governmental agency, and any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staffs.

118.    Plaintiffs John and Elizabeth Brady and Sharon Coughlin also bring this action on behalf of a California subclass defined as follows:

All persons in the State of California who subscribed to Cox for Premium Cable and paid Cox a monthly rental fee for an accompanying set-top box.

119.    Plaintiffs seek certification of the Class and subclasses under Federal Rules of Civil Procedure Rule 23(a) and (b)(3).

120.    <u>Numerosity:</u>  The members of the Class and subclasses are so numerous that their individual joinder would be impracticable in that: (a) the Class includes thousands of individual members and the subclasses include hundreds, if not thousands, of individual members; (b) the precise number of Class and subclass members and their identities are unknown to Plaintiffs but are well known to Defendants and can easily be determined through discovery; (c) it would be impractical and a waste of judicial resources for each of the thousands of individual Class members and subclass members to be individually represented in separate actions; and (d) the relatively small amount of damages suffered by some of the Class and subclass members does not make it economically feasible for those Class and subclass members to file individual actions to protect their rights.

121.   <u>Commonality/Predominance:</u>     Common questions of law and fact predominate over any questions affecting only individual Class and subclass members. These common legal and factual questions include, but are not limited to, the following:

a.     Whether Cox is liable to Plaintiffs and the Class for violations of federal antitrust laws;

b.     Whether Cox has established an unlawful tying arrangement for the rental of set-top boxes, in violation of federal laws;

c.     Whether Cox's actions have caused damages to Plaintiffs and the Class;

d.     Whether Cox should be enjoined from further violations of state and federal laws;

e.     Whether Cox is liable to Plaintiffs and the Class for treble damages as a result of its violation of federal antitrust laws.

122.   <u>Typicality:</u>  Plaintiffs' claims are typical of the claims of the Class and subclass members.  Plaintiffs and all Class and subclass members have been injured by the same wrongful practices engaged in by Defendants.  Plaintiffs' claims arise from the same practices and course of conduct that gives rise to the claims of the Class and subclass members and are based on the same legal theories.

123.   <u>Adequacy:</u>  Plaintiffs will fully and adequately assert and protect the interests of the Class and subclasses they seek to represent.  Plaintiffs have retained counsel who are experienced in class actions and complex mass tort

litigation. Neither Plaintiffs nor their counsel have interests contrary to or conflicting with the interests of the Class or subclasses.

124. <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims by each of the Class members and subclass members is economically unfeasible and impractical. While the aggregate amount of the damages suffered by the Class is in the millions of dollars, the individual damages suffered by each Class member and subclass member as a result of the wrongful conduct by Defendants are too small to warrant the expense of individual lawsuits. Even if the individual damages were sufficient to warrant individual lawsuits, the court system would be unreasonably burdened by the number of cases that would be filed.

125. Plaintiffs do not anticipate any difficulties in the management of this litigation. The federal courts have substantial experience in managing antitrust class actions.

## <u>COUNT I</u>

### (<u>Violation of Section 1 of the Sherman Act for Unlawful Tying</u>)

126. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

127. The Sherman Act makes it unlawful to enter into a contract in restraint of trade or commerce. 15 U.S.C. § 1. Congress has granted a private right of action to individuals harmed by violations of this act. 15 U.S.C. § 15.

128. Plaintiffs, on their own behalf and on behalf of the Class, seek to recover damages they suffered as a result of Cox's violation of the Sherman Act.

129. Cox improperly ties its Premium Cable service to the rental of set-top boxes that it distributes. Specifically, as explained above, Cox contracted with Plaintiffs and all Class Members to provide Premium Cable on the condition that Plaintiffs and all Class Members also rent the set-top boxes that it distributes.

130. No Class Member can untie the two products at issue, Premium Cable and set-top boxes.

131. The market for set-top boxes is separate and distinct from the market for Premium Cable, just as a set-top box is a separate product from Premium Cable.

132. Cox has sufficient economic power in the areas in which it operates to force Class Members to rent the set-top boxes that it distributes and to deny Class Members the opportunity to acquire set-top boxes in an open market. Indeed, Cox compels Class Members to rent set-top boxes at prices that quickly add up to more than the amount Cox paid to purchase them in the first place.

133. By forcing Class Members to rent the set-top boxes that it distributes, Cox significantly restrains the ability of consumer electronics manufacturers to sell set-top boxes and the ability of consumers to purchase set-top boxes at retail.

134. This improper tying arrangement harms competition.

135. Cox's conduct affects a substantial amount of interstate commerce in the market for set-top boxes.

136. There is no lawful justification for that conduct, which causes direct harm to the Class Members.

137.    Cox's tying arrangement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

## COUNT II

### (Violation of State Antitrust Laws on Behalf of All Plaintiffs Against All Defendants)

138.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs.

139.    Defendants' wrongful acts violated the Federal Sherman Antitrust Act (15 U.S.C. §1, *et seq.*) as set forth above.

140.    Defendants' same actions violated the state antitrust statutes of the various states in which Defendants do business (including but not limited to the Uniform Arizona Antitrust Act, A.R.S. §44-1402, *et seq.*; the Louisiana Antitrust Act, La. R.S. §51:122, *et seq.*; the Oklahoma Antitrust Reform Act, Okla. Stat. 79 §§ 201, *et seq.*; the California Cartwright Act, California Business & Professions Code §16700, *et seq.*).

## COUNT III

### (Unjust Enrichment on Behalf of All Plaintiffs As Against All Defendants)

141.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs.

142.    Defendants have been unjustly enriched in the amount of the profits they have earned as a result of the Defendants' conduct as alleged herein.

143.    Defendants have been unjustly enriched at the expense of and to the detriment of the Plaintiffs and each member of the Class.

144.    Defendants should be ordered to disgorge the profits they have made from their wrongful and illegal conduct alleged herein.

## COUNT IV

**(Violation of Cal. Business & Professions Code §§ 17200, *et seq*. on Behalf of Plaintiffs John and Elizabeth Brady and Sharon Coughlin and the California Subclass of Plaintiffs as Against All Defendants)**

145.    Plaintiffs John and Elizabeth Brady and Sharon Coughlin hereby incorporate by reference all allegations contained in the preceding paragraphs.

146.    California Business & Professions Code Section 17200, *et seq*., provides that unfair competition includes, but is not limited to, "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading marketing."

147.    By and through their conduct, including the conduct detailed above, Defendants engaged in activities which constitute unlawful, unfair, and fraudulent business practices prohibited by Business & Professions Code Section 17200, *et seq*. Defendants have committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices within the meaning of Business & Professions Code Section 17200, *et seq*., by engaging in the unlawful tying arrangements detailed herein.  This unlawful conduct includes, but is not limited to, engaging in the unlawful tying arrangements detailed herein that violate the Sherman Act.

148.    Defendants have committed acts of unfair competition that are prohibited by Business and Professions Code Section 17200, *et seq*.  Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes, by engaging in practices that threatens an incipient violation of the law, or violates the policy or spirit of laws because its effects are comparable to or the same as a violation of the law by engaging in the unlawful tying arrangements detailed herein.

149.     In the alternative, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes, by engaging in practices that are immoral, unethical, oppressive, or unscrupulous, the utility (if any) of which conduct is far outweighed by the harm done to consumers and the public policy by engaging in the unlawful tying arrangements detailed herein.

150.     Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes, by engaging in practices wherein: (i) the injury to the consumer was substantial; (ii) the injury was not outweighed by any countervailing benefits to consumers or competition; and (iii) the injury was of the kind that the consumers themselves could not reasonably have avoided by engaging in the unlawful tying arrangements described herein.

151.     Defendants committed acts of unfair competition, including those described above, prohibited by Business and Professions Code Section 17200, *et seq*., by engaging in a pattern of "fraudulent" business practices within the meaning of Business and Professions Code Section 17200, *et seq*., by engaging in the unlawful tying arrangements detailed herein.

152.     Defendants engaged in these unlawful, unfair, fraudulent business practices for the primary purpose of collecting unlawful and unauthorized monies from Plaintiffs John and Elizabeth Brady and Sharon Coughlin and all others similarly situated, thereby unjustly enriching Defendants.

153.     As a result of the repeated violations described herein, Defendants received and continue to receive unearned commercial benefits at the expense of their competitors and the public.

154.     Defendants' unlawful, unfair and fraudulent business practices presents a continuing threat to the public in that Defendants continue to engage in illegal conduct.

155.     Such acts and omissions are unlawful and/or unfair and/or fraudulent and constitute a violation of Business and Professions Code Section 17200, *et seq*. Plaintiffs John and Elizabeth Brady and Sharon Coughlin reserve the right to identify additional violations by Defendants as may be established through discovery.

156.     As a direct and legal result of their unlawful, unfair and fraudulent conduct as described herein, Defendants have been and will be unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiffs John and Elizabeth Brady and Sharon Coughlin, who provided money to Defendants based on Defendants' unlawful tying arrangement.

157.     Plaintiffs John and Elizabeth Brady and Sharon Coughlin and members of the California Subclass suffered an "actual injury" because their money was taken by Defendants as a result of Defendants' unlawful tying arrangements.

158.     In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiffs John and Elizabeth Brady and Sharon Coughlin seek the recovery of reasonable attorneys' fees pursuant to California Code of Civil Procedure Section 1021.5, which is available to a prevailing plaintiff who wins relief for the general public.

159.     Plaintiffs John and Elizabeth Brady and Sharon Coughlin and the California subclass are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct. The amount of damages suffered by Plaintiffs John and Elizabeth Brady and Sharon Coughlin and the California subclass as a result of

said acts by Defendants was a sum certain and capable of calculation, and Plaintiffs John and Elizabeth Brady and Sharon Coughlin and the California subclass are entitled to interest in an amount to be set forth according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, demands judgment in their favor and against Cox as follows:

a.    For an order certifying the Class pursuant to Fed. R. Civ. P. 23, appointing Plaintiffs as the Class Representatives, and appointing counsel as Plaintiffs counsel for the class;

b.    For an Order that Cox violated the Sherman Act, 15 U.S.C. § 1;

c.    For an Order that Cox violated the State antitrust laws listed above;

d.    For an Order that Cox unjustly enriched itself at the Class' expense;

e.    For an Order that Cox violated Cal. Bus. & Prof. Code § 17200;

f.    For an Order enjoining Cox from continuing the practice of tying premium cable services to the rental of a set-top box from Cox;

g.    For an award of all statutory damages under the Sherman Act;

h.    For an award of all compensatory and other damages suffered by Plaintiffs and the Class;

i.    For an award of all costs incurred by Plaintiffs in pursuing this actions;

j.    For an award of reasonable attorneys' fees;

k.    For any other relief the Court deems reasonable.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues triable.

Dated the 24th day of August, 2009.

Respectfully submitted,

s/ A. Daniel Woska_____
A. Daniel Woska, OBA No. 9900
Rachel Lawrence Mor, OBA No. 11400
Michael J. Blaschke, OBA No. 868
S. Randall Sullivan, OBA No. 11179
A. DANIEL WOSKA & ASSOCIATES, P.C.
3037 N.W. 63rd Street, Suite 251
Oklahoma City, OK 73116
405-562-7771 (Telephone)
405-285-9350 (Facsimile)
Email: awoska@woskalawfirm.com
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2009, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to ALL ECF registrants, including but not limited to:

D. Kent Meyers:  meyersd@crowedunlevy.com
Bruce Sokler: bsokler@mintz.com
Geren T. Steiner:  geren.steiner@crowedunlevy.com

s/A. Daniel Woska_____