IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| COX ENTERPRISES, INC. SET-TOP | ) | 09-ML-2048-C |
| CABLE TELEVISION BOX | ) | |
| ANTITRUST LITIGATION | ) | |

O R D E R

Plaintiffs filed the present action as individual class actions in the states of Arizona, California, Florida, Louisiana, Oklahoma, and Nevada. These cases were consolidated into the present multi-district litigation case. In their Complaints, the various Plaintiffs allege anti-trust violations by Defendants Cox Enterprises, Inc., and Cox Communications, Inc. ("Cox"). At the direction of the Court, the Plaintiffs filed a Consolidated Class Action Complaint ("CAC"). In response to this filing, Defendants have filed a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

In the CAC, Plaintiffs allege that Defendants illegally tie the rental of a set-top cable box to the purchase of premium channels, thereby violating the Sherman Anti-Trust Act and the anti-trust laws of the various states where the original actions were brought. Plaintiffs identify premium cable as a higher-quality, more user friendly, and far more comprehensive package than basic cable, as premium cable includes an interactive programming guide, pay-per-view channels, on-demand, high-definition channels, a range of premium and specialty channels, and a range of channels that subscribers may pay to receive. According to Plaintiffs, premium cable is the tying product and the set-top boxes are the tied product.

According to Plaintiffs, the only way Defendants' customers may access the full panoply of premium cable products is by renting a set-top box from Cox.  Plaintiffs then set forth a number of allegations of conduct of Cox's employees in promoting the rental of the set-top box to their customers, noting that the boxes cannot be purchased, but must be rented and that only the boxes provided by Cox will work with Cox's system.  Plaintiffs also allege that Cox has substantial market power in the tied market, as there is limited to no competition for the services which they provide and substantial hurdles or barriers to any new provider coming into the market.

## STANDARD OF REVIEW

The parties are in dispute regarding the standard by which the Court must review the allegations of the CAC.  Defendants argue that the holdings of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1950 (2009), have altered the landscape of pleading and that measured against this new standard, the quality of the facts alleged by Plaintiffs fails to state a claim for relief.  Defendants argue this is particularly true in this case, a mass-filed antitrust case, which will require more particularity than other actions.  Plaintiffs assert that Defendants seek to impose too strict a standard and that they must do no more than plead facts which demonstrate the allegations are plausible.

The Court agrees that Defendants argue for a pleading standard beyond that required by Fed. R. Civ. P. 8.  Indeed, the Court notes that Twombly specifically disavows imposing a heightened pleading standard.  Nevertheless, Twombly and its progeny have moved the

Court's analysis from the "no set of facts in support of his claim which would entitle him to relief" standard of <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957), in favor of examining the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief." <u>Alvarado v. KOB-TV, L.L.C.</u>, 493 F.3d 1210, 1215 (10th Cir. 2007) (<u>citing Bell Atl.</u>, 550 U.S. at 555-56, and <u>Erickson v. Pardus</u>, 551 U.S. 89, 93-94 (2007)).  While there is no heightened pleading standard, the requirements have changed "[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." <u>Ridge at Red Hawk, L.L.C. v. Schneider</u>, 493 F.3d 1174, 1247 (10th Cir. 2007).

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

<u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247 (10th Cir. 2008) (internal citation omitted).  It is through this lens that the Court examines the CAC.

## <u>ANALYSIS</u>

### I.  Sherman Act Claims

Plaintiffs allege that Defendants illegally tie the requirement of a set top box and the purchase of premium cable.  According to Plaintiffs, for no reason other than Defendants' profit, a customer wishing to purchase premium cable and receive the benefits of that service

must also rent a set top box from Defendants.  Plaintiffs argue this arrangement violates the Sherman Anti-Trust Act.

In order to make out a prima facie claim for tying, Plaintiffs must allege "(1) two separate products, (2) a tie – or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying product market, and (4) a substantial volume of commerce affected in the tied product market.  Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc., 63 F.3d 1540, 1546 (10th Cir. 1995).  Defendants argue that Plaintiffs have failed to allege facts sufficient to make out a plausible claim for each of these four elements.

1.  Two Separate Products

Defendants argue that the allegations in Plaintiffs' CAC do not demonstrate that there are two separate products involved.  According to Defendants, premium cable cannot exist without a set-top box and a set-top box has no function without premium cable; and thus the two items are integrated components of a unitary cable system.  The question is whether, from the consumer's point of view, an independent market exists for the tied product.  See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 19-21 (1984) *abrogated on other grounds by* Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 31 (2006).

The CAC alleges that consumers can differentiate premium cable from a set-top box. As Plaintiffs argue, the two items are quite distinct.  The cable service is the video stream, while the set-top box is a mechanism which is required to permit viewing.  Moreover, it is clear from the allegations in the CAC that Defendants view the two items as separate, as they

market each with individual prices.  Further, Plaintiffs have raised allegations that the set-top boxes are available from a source other than Defendants, thereby raising a plausible claim that an independent market exists for the set-top box.  Indeed, the Court finds the allegations raised here are sufficient to state a claim for tying, as demonstrated by <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. 451, 463 (1992).  Defendants' argument that there is a relationship between cable television and set-top boxes and thus it cannot be said that they are tied or are independent products is without merit.  As the Supreme Court stated in <u>Jefferson Parish</u>, "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." 466 U.S. at 19, n.30.

## 2.  The Tie

Defendants next argue that there are not sufficient allegations of coercion to establish a prima facie case.  According to Defendants, an essential element of a tying claim is that "'"purchases of the tying product must be conditioned upon purchases of a distinct tied product."'" <u>Multistate Legal Studies</u>, 63 F.3d at 1548 (quoting <u>Continental Trend Resources, Inc. v. Oxy USA, Inc.</u>, 44 F.3d 1465, 1481 (10th Cir. 1995)).  Defendants argue that the FCC has ruled that Plaintiffs are free to purchase digital cable service, including premium channels, without also taking a set-top box.  In this regard, Defendants rely on the availability of cable cards to establish that premium cable is available without also renting a set-top box.

Defendants' argument is disingenuous.  It is clear from the allegations in the CAC that customers wishing to receive the full benefit of their premium cable subscription have no

choice but to rent a set-top box from Cox.  Indeed, as the CAC demonstrates, Cox's own advertising and consumer communication establishes this relationship.  Moreover, the CAC alleges Defendants have engaged in conduct which minimizes the viability of the use of cable cards to receive the full panoply of premium cable services.  Thus, the Court finds that Plaintiffs have alleged facts sufficient to demonstrate Cox has engaged in coercion, thereby satisfying the second element of a prima facie case.

## 3.  Economic Power

The third element requires proof that Cox has sufficient economic power in the tying product market to force buyers to accept the tied product.  To satisfy the elements of this portion of the prima facie case, Plaintiffs must allege that Cox "possess[es] sufficient power in the tying market to compel acceptance of the tied product."  Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc., 806 F.2d 953, 957 (10th Cir. 1986).  When considering the question of economic power within the market, the relevant market must be defined in two dimensions – product market and geographic market.  See Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111 (10th Cir. 2008).  The product market is defined by products that a consumer could reasonably substitute for another.  Alternative products to which consumers might turn in the event of a price increase are considered to be in the same product market.  The geographic market consists of the geographic area where buyers could reasonably turn for alternative sources of supply.  Any attempt to define a relevant geographic market must take into account the commercial realities of the industry.  Market power has been defined as "the

power to control prices or exclude competition." <u>Bd. of Regents of Univ. of Okla. v. Nat'l Collegiate Athletics Ass'n</u>, 707 F.2d 1147, 1158 (10th Cir. 1983)

In considering whether Plaintiffs have alleged facts sufficient to demonstrate the relevant product market, the Court should examine the "the 'strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand.'" <u>Tops Mkts., Inc. v. Quality Mkts., Inc.</u> 142 F.3d 90, 98 (2d Cir. 1998) (<u>quoting</u> <u>Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.</u>, 812 F.2d 786, 792 (2d Cir. 1987)). The CAC alleges that Cox faces minimal competition in the defined geographic areas. Indeed, the CAC pleads facts from Cox's own regulatory filings which demonstrate that Cox provides cable services to 59% of the potential customers that its system reaches and that in no area does it provide service to less than 46%. Plaintiffs argue that these numbers actually underestimate the percentage of potential customers Cox reaches because numerous potential subscribers who do not purchase Cox services simply do not subscribe to any multi-channel television programming at all. Plaintiffs argue that, to the extent Cox relies upon satellite television service providers as demonstrating it does not have market power, the allegations in the CAC, which are derived from Cox's website, outline the distinct differences between the two services. Thus, Plaintiffs have pleaded sufficient facts to establish a relevant product market.

The Supreme Court has set out the standards to be used in defining the relevant geographic market. "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must,

therefore, both 'correspond to the commercial realities' of the industry and be economically significant."  Brown Shoe Co. v. United States, 370 U.S. 294, 336-37 (1962) (citation and footnote omitted).  The allegations in the CAC allege that Cox treats the geographic areas defined by the Complaint as a unified whole, imposing similar policies in each area, raising prices in each area, consistently requiring the rental of set-top boxes, and limiting the appeal of cable cards.  Further, Plaintiffs argue that they will prove that the decisions made regarding these issues arise from the various corporate departments at Cox's Atlanta headquarters.  While it may be that some of the geographic areas defined by Plaintiffs are overly broad at this stage of the proceedings, the Court finds that Plaintiffs have sufficiently alleged facts demonstrating a relevant geographic market.  Having plead facts which could plausibly support their claims of product and geographic market, Plaintiffs have sufficiently pleaded that Defendants have market power.

4.  Volume

 The final element that Plaintiffs must address is whether or not Defendants control a sufficient volume of commerce in the tied market to affect trade.  "[T]he controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie."  Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 501 (1969).  Plaintiffs argue they have demonstrated sufficient volume in two ways.  First, Plaintiffs note the CAC raises allegations of complaints from other consumer electronics manufacturers about the inability to compete with cable service providers in the manufacture and sale of set-top boxes due to the

manipulative conduct of Defendants.  The CAC also notes that when consumers inquire from Defendants as to the ability to use or purchase a set-top box from an entity other than Cox, they are told the only boxes which are compatible with Cox's system are those rented by Cox.  As noted earlier in examining the market and geographic power of Defendants, it is clear that they control a substantial portion of the market by limiting the ability of other providers to provide set-top boxes.  The allegations of the CAC plausibly support the conclusion that Defendants control a substantial amount of dollar volume and foreclose that volume to competitors by way of the illegal tie.

## II.  FCC Regulation

Defendants argue that the allegations in the CAC improperly attempt to convert a regulatory issue into an unlawful antitrust tying scheme.   According to Defendants, Plaintiffs' allegations are nothing more than an attempt to make an end run around the regulatory regime established by Congress in Section 629 of the Communications Act which is administered by the FCC.  Defendants argue that Plaintiffs' attempted end run must be cut short, relying on the Supreme Court in Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004).   According to Defendants, the Plaintiffs' attempted antitrust claims here must fail for the same legal reasons set out in Trinko.  That is, Defendants argue, the Communications Act and the FCC's regulatory scheme have created the mechanism for addressing the complaints raised by Plaintiffs and therefore there is minimal, if any, risk of antitrust harm.  According to Defendants, Congress has taken upon itself the task of eventually creating a new market for set-top boxes and the FCC passed rules

dictating in all respects the manner, scope, and timing in creation of that market.  Because of these two facts, Defendants assert, the holding of <u>Trinko</u> mandates that an antitrust action is improper.

The Court finds Defendants' arguments without merit.  Closely read, it is clear that <u>Trinko</u> is inapplicable to the case at bar.  <u>Trinko</u> evolved from the deregulation of local exchange carrier telephone service and the plaintiffs' argument that the local exchange carriers were improperly implementing portions of the Telecommunications Act of 1996.  The <u>Trinko</u> plaintiffs brought an antitrust action to force the local exchange carriers to comply with the terms of the Act.  The Supreme Court rejected the claim, finding that the antitrust laws could not be used to enforce a regulatory scheme created by Congress.  Thus, <u>Trinko</u> is legally and factually distinguishable from the present case.  Here, Plaintiffs are seeking to enforce antitrust laws with claims that would exist absent the regulation Defendants argue is controlling.  Because Plaintiffs' claims would exist even in the absence of the regulation, <u>Trinko</u> has no bearing on the outcome of the present case and Defendants' argument in this regard will be denied.

## III.  State Law Claims

Defendants argue that Plaintiffs' state antitrust law claims, claims of unjust enrichment, and claims under the consumer protection laws of California must be dismissed for the same reasons the federal claims cannot survive.  Because the Court has found the federal claims valid, Defendants' arguments in regard to these claims will be denied.

## <u>CONCLUSION</u>

For the reasons set forth more fully herein, Defendants' Motion to Dismiss The First

Amended Consolidated Class Action Complaint (Dkt. No. 20) is DENIED.

IT IS SO ORDERED this 19th day of January, 2010.


_____
ROBIN J. CAUTHRON
United States District Judge