IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

In re:                                     )
                                           )
COX ENTERPRISES, INC. SET-TOP              )     Case No. 09-ML-2048-C
CABLE TELEVISION BOX                       )
ANTITRUST LITIGATION                       )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Plaintiffs filed the present suit against Defendant Cox Enterprises, Inc. ("Cox")

alleging that Defendant illegally forces customers to rent a Cox set-top box ("STB") in order

to gain full access to Cox's premium cable services in violation of the Sherman Act, 15

U.S.C. § 1.   Presently, Plaintiffs move this Court to certify the class pursuant to

Fed. R. Civ. P. 23.

### II.  BACKGROUND

Plaintiffs bring this action on behalf of themselves and the following putative class:

All persons in the United States who subscribed to Cox for premium cable and paid Cox a

monthly rental fee for an accompanying set-top box.[1]  Additionally, Plaintiffs Elizabeth Ann

Brady, John Joseph Brady, and Sharon Coughlin seek certification of the following subclass:

---

[1]  Plaintiffs exclude the following people from their definition of the class:  Plaintiffs'
counsel; Defendant's employees; government agencies; this Court and the immediate family
members and staff of the Court.  Originally, Plaintiffs also excluded addresses where the consumer
receives multi-channel video programming distribution ("MVPD") service from at least one other
cable MVPD.  However, Plaintiffs no longer exclude this category of people and offer to file another
amended complaint to reflect this change.  Because Plaintiffs' Motion for Class Certification is
herein denied, this request is moot.

All persons in the State of California who subscribed to Cox for premium cable and paid Cox

a monthly rental fee for an accompanying set-top box.

Cox is one of the five largest cable providers of multi-channel video programming

distribution ("MVPD") in the United States and provides cable service to customers across

the nation in 19 different states.  (Pls.' Compl., Dkt. No. 17, at 4; Def.'s Br., Dkt. No. 181,

at 10.)  Cox offers several different tiers of cable packages, including basic cable and digital

cable.[2]  Before a customer may subscribe to digital video programming, that customer must

subscribe to Cox TV Starter, formerly Cox Limited Basic ("basic cable"). Basic cable is

primarily over-the-air broadcast stations, without interactive digital programming.  (Class

Certification Hr'g Tr. 110, Nov. 16, 2011.)  Under Federal Communications Commission

("FCC") regulations, every cable subscriber must buy basic cable before being permitted to

subscribe to premium cable.

Specific channels and digital cable tiers available to customers vary across Cox's

national footprint, as do prices.  (Def.'s Br., Dkt. No. 181 Ex. 11.)  Unlike basic cable,

customers need a device that will unscramble the encrypted signals in order to access digital

programming. (Pls.' Compl., Dkt. No. 17, at 6-7.)  One such device is a set-top box.  Set-top

boxes perform another function:   they allow cable providers and their customers to

communicate   back   and   forth   ("bi-directionally")   so   that   customers   can   utilize

---

[2]  For example, Cox customers can subscribe to various Paks based on their particular
interests, like the Sports & Information Pak and the Movie Pak.  (Def.'s Br., Dkt. No. 181, at 11 &
n.26 (describing the different channels available in the Sports and Information Pak depending on
the region).)

features—Pay-Per-View ("PPV"), Video on Demand ("VOD"), and Interactive Programming Guide ("IPG")—that require such communication.  While specific packages vary, all Cox customers who subscribe to digital video programming and rent a Cox set-top box have access to Cox's IPG, VOD, and PPV.

Originally, set-top boxes included integrated technology that would descramble the signal and allow customers to watch digital programming.  In 2004, the FCC required cable operators to offer the descrambling technology in separate devices, called CableCards.  (Def.'s Br., Dkt. No. 209 Ex. 2, at 4 & n.13.)  Instead of renting a set-top box, Cox customers could rent, for roughly two dollars per month, a CableCard from Cox that would descramble the encrypted signals.  (Hr'g Tr. at 49; Def.'s Br., Dkt. No. 181, at 18.)  Unlike Cox's set-top box, however, CableCards do not grant access to Cox's interactive features, such as Cox's IPG or VOD.  (Pls.' Compl., Dkt. No. 17, at 6-7.)  Additionally, in order to function, CableCards require a reader slot, either directly into a CableCard ready television or other CableCard enabled device.  (Id. at 11.)  In 2007, the FCC prohibited cable companies from integrating the technology into set-top boxes and required that boxes have CableCard slots and separate CableCards.  (Id.; Def.'s Br., Dkt. No. 181, at 18.)

Instead of or in addition to renting a set-top box directly from Cox, Cox customers can purchase their own set-top box, such as TiVO or Moxi, which allows access to cable programming, but not Cox's interactive programming like IPG or VOD.  (Def.'s Br., Dkt. No. 181, at 17.)  Additionally, other MVPD providers compete with Cox for digital programming subscriptions, including AT&T U-Verse, Qwest/CenturyLink, Verizon FiOS,

EATEL, Wide Open West, LUS Fiber/Lafeyette Utility Services, and the direct broadcasting satellite ("DBS") providers, DISH Network and DirecTV.  (Id. at 13-17.)

In 2009, multiple Cox premium cable subscribers filed class action suits in various jurisdictions against Cox for allegedly illegally tying its premium cable service to rental of a Cox set-top box.  (Pls.' Br., Dkt. No. 160, at 4-5.)  At Defendant's request, the United States Judicial Panel on Multidistrict Litigation ("JPML") consolidated these actions and transferred them to this Court for resolution.  (Order, Dkt. No. 1.)  For two years following that transfer, the parties have conducted discovery and litigated this matter.  On November 16 and 17, 2011, the Court held a hearing on Plaintiffs' Motion for Class Certification where the parties presented argument and their respective expert witnesses testified.

### III.  CLASS CERTIFICATION STANDARD

Before a plaintiff may represent a class in an action, the Court must first find that the plaintiff has satisfied the requirements of Rule 23.  The first subpart of this Rule requires that

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Once Rule 23(a) has been satisfied, then the plaintiff must show that it meets one of the three types of actions under Rule 23(b).  Here, Plaintiffs assert that this action fits within subpart (b)(3), which requires:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that

a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b).

Before deciding whether to certify a class, the Court must conduct a "rigorous analysis" of whether Plaintiffs have met their strict burden of proof that the Rule 23 requirements have been met.  Rex v. Owens ex rel. State of Okla., 585 F.2d 432, 435 (10th Cir. 1978).  While conducting this analysis may involve considerations enmeshed in the factual and legal issues comprising a plaintiff's cause of action, the court is not to pass judgment on whether plaintiffs will prevail on the merits.  Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982); Vallario v. Vandehey, 554 F.3d 1259, 1266 (10th Cir. 2009) (stating that "no 'impermeable wall' exists between the merits of a case and a district court's decision whether to certify a class.").  "Rule 23 does not set forth a mere pleading standard. [Parties] seeking class certification must affirmatively demonstrate [their] compliance with the Rule—that is, [they] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  Wal-Mart Stores, Inc. v. Dukes, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011).

## IV.  DISCUSSION

Before analyzing whether the Rule 23 requirements have been met, the Court must first determine whether the suit has been brought by "[o]ne or more members of [the] class." Fed. R. Civ. P. 23(a); Paton v. N.M. Highlands Univ., 275 F.3d 1274, 1278 (10th Cir. 2002). All of the named Plaintiffs live within the United States, subscribed to Cox's premium cable,

and rented a Cox set-top box during the relevant period.[3]  Therefore, members of the class

have brought the present suit, and the Court may proceed in its analysis of whether Plaintiffs

have satisfied Rule 23's requirements.

A.  Rule 23(a)

1.  Numerosity

To satisfy this element, "[t]he burden is upon plaintiffs seeking to represent a class

to establish that the class is so numerous as to make joinder impracticable."  Peterson v.

Okla. City Hous. Auth., 545 F.2d 1270, 1273 (10th Cir. 1976).  The Tenth Circuit has not

adopted a set number as presumptively sufficient to meet this burden, and there is "'no set

formula to determine if the class is so numerous that it should be so certified.'"  Trevizo v.

Adams, 455 F.3d 1155, 1162 (10th Cir. 2006) (quoting Rex v. Owens ex rel. State of Okla.,

585 F.2d 432, 436 (10th Cir. 1978)).  Whether a class satisfies the numerosity requirement

is "a fact-specific inquiry" that district courts have "wide latitude" when determining.  Id.

Here, the purported class includes more than three million current or former Cox

customers, scattered across nineteen states, who subscribed to premium cable and rented a

Cox set-top box.  (Pls.' Br., Dkt. No. 160 Ex. 3, at 62.)  Considering the large number of

class members dispersed across the nation, Plaintiffs have established that the number is too

---

[3] The named representatives include the following people:  David Abdullah; Bobby Bowick; Elizabeth and John Brady; Sharon Coughlin; Jessica Diket; Bradley Gelder; Trevor Haynes; Michael Helmstetter, Jr.; Henry Holmes; Barksdale Hortenstine; Ernest Johnson; Sandra Prezgay; Danielle Smith; and Ron Strobo.

6

great to render individual joinder of the class members practicable.  Accordingly, Plaintiffs have satisfied the requirements of Rule 23(a)(1).

### 2.  Commonality

This requirement is generally established when the plaintiff's claims have "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  However, it is not enough to allege that all members of the class "have . . . suffered a violation of the same provision of law."  Wal-Mart Stores, Inc., ___ U.S. at ___, 131 S. Ct. at 2551.  Rather, the plaintiff must prove a common contention that can be remedied with classwide resolution.  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  Id. (quoting Falcon, 457 U.S. at 157).  For purposes of commonality, "'[e]ven a single [common] question' will do."  Id. at 2556 (alterations in original) (quoting id. at 2566 n.9 (Ginsburg, J., dissenting)).

Here, the same practices—namely, the alleged tie that Cox customers are required to rent a Cox set-top box to access Cox's interactive features—"touch and concern all members of the class." (quoting id. at 2566 n.7 (Ginsburg, J., dissenting)).  The complained-of conduct is a common practice that Cox applied to all members of the class, regardless of what specific package they subscribed to or the geographic region in which they lived.  (Pls.' Br., Dkt. No. 160 Ex. 13, 18, 19 (stating that "[i]n order to receive Interactive TV services offered by Cox, such as the Interactive Programming Guide, On Demand, and Pay-Per-View, and all programming options, you must rent a [Cox set-top box]").)  It is this conduct that serves as the basis for Plaintiffs' illegal tying claim, and the resolution of multiple elements of this

7

claim, such as whether the products are separate, would be common to the class.  Because

a common question—whether Cox illegally tied access to its interactive programming to

rental of a Cox set-top box—arises as to all members of the class and a classwide proceeding

will generate a common answer that drives the resolution of the litigation, the requirements

of Rule 23(a)(2) are satisfied.[4]  <u>Wal-Mart</u>, ___ U.S. at ___, 131 S.Ct. at 2551.

### 3.  Typicality

Rule 23(a)'s commonality and typicality requirements "tend to merge," and both

facilitate the determination of "whether under the particular circumstances maintenance of

a class action is economical and whether the named plaintiff's claim and the class claims are

so interrelated that the interests of the class members will be fairly and adequately protected

in their absence."  <u>Falcon</u>, 457 U.S. at 157-58 n.13.  Typicality is satisfied when the class

representatives' claims and proposed class members' claims are "based on the same legal or

remedial theory."  <u>Adamson v. Bowen</u>, 855 F.2d 668, 676 (10th Cir. 1988).  Moreover,

"differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so

long as the claims of the class representative and class members are based on the same legal

or remedial theory."  <u>Id.</u>

---

[4]  "In a class action brought under Rule 23(b)(3), the commonality requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions."  <u>Lienhart v. Dryvit Sys., Inc.</u>, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (<u>quoting</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 609 (1997)) (internal quotation marks omitted).  The Rule 23(b)(3) predominance requirement is "far more demanding" than Rule 23(a)(2)'s commonality requirement.  <u>Amchem Prods.</u>, 521 U.S. at 623.

Here, Plaintiffs complain of one policy of conduct that they allege amounts to an illegal tie, which is the same claim of the named representatives and the class members. While Defendant argues that it will have different defenses against different class members, this difference does not preclude a finding that Plaintiffs have satisfied the requirements of Rule 23(a)(3).  DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010) (finding that "typicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."). Nor does the fact that there may be a damage disparity mean that the claims of the class representatives and the class members are atypical.  Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1764, at 266-69 & n.13 (3d ed. 2005); see Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982).  Named Plaintiffs' and the class members' claims are based on the same legal theories and arise from the same pattern of conduct by Defendant.  Accordingly, Plaintiffs have satisfied this requirement.

### 4.  Adequacy

Adequacy of representation depends on resolution of two questions: "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"[5] Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir.

---

[5]  In 2003, Rule 23 was amended so that the determination of whether class counsel would fairly and adequately represent the class occurs after the class has been certified. Fed. R. Civ. P. 23(g).

2002) (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)).  Lanner v. Wimmer, 662 F.2d 1349, 1357 (10th Cir. 1981) ("It is not fatal if some members of the class might prefer not to have violations of their rights remedied.") (internal quotation marks and citations omitted).

Plaintiffs contend there are no conflicts between the named Plaintiffs and the class members, and Defendant has proffered none.  For two years, the named Plaintiffs have pursued this litigation diligently and adequately represented all members of the class. Therefore, Plaintiffs have satisfied Rule 23(a)(4).  Because the requirements of Rule 23(a) have been met, Plaintiffs must now establish that the case fits into one of the three categories under Rule 23(b).  Here, Plaintiffs allege the case satisfies the requirements of Rule 23(b)(3).

### B.  Rule 23(b)(3)

Under this subpart, Plaintiffs must show that the common issues will predominate over any individualized issues and that a class action is the superior method for adjudicating the action.  Rule 23(b)(3) points to the following factors when making this determination: "the class members' interests in individually controlling the prosecution . . . of separate actions; . . . the extent and nature of any litigation concerning the controversy already begun by . . . class members; . . . the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and . . . the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

### 1.   Whether Common Issues Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  In order to determine whether common issues will predominate over individualized issues, the underlying elements of the substantive claim—here, the tying claim—must be identified. See, e.g., Alabama v. Blue Bird Body Co. Inc., 573 F.2d 309, 316 (5th Cir. 1978); Freeland v. AT&T Corp., 238 F.R.D. 130, 142 (S.D.N.Y. 2006) ("In making [the predominance] determination, a court considers whether the putative class members 'could establish each of the . . . required elements of [their] claim[s] . . . using common evidence.'" (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001), superseded by statute on other grounds, Fed. R. Civ. P. 23, as recognized in Attenborough v. Constr. & Gen. Bldg. Laborers Local 79, 238 F.R.D. 82, 100 (S.D.N.Y. 2006), and overruled on other grounds by In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 40 (2d Cir. 2006))).

### a.   The Tying Claim

In order to establish a violation of § 1, a party must show the existence of "'a contract, combination or conspiracy that unreasonably restrains trade in the relevant market.'" Full Draw Prods. v. Easton Sports, Inc., 182 F.3d 745, 756 (10th Cir. 1999) (quoting TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1027 (10th Cir. 1992)); Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.").

To succeed on their tying claim, Plaintiffs must establish the following elements: (1) two separate products or services are involved; (2) the sale or agreement to sell one product or service is coerced or conditioned upon the purchase of another; (3) the seller has sufficient power in the tying product market to enable it to restrain trade in the tied product market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected. MultiState Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc., 63 F.3d 1540, 1546 (10th Cir. 1995). Additionally, Plaintiffs must establish that the class has suffered an antitrust injury or impact.

"Tying arrangements are unlawful '[b]ecause they deny competitive access to the tied product market on the basis of the seller's leverage in the tying product market, and force buyers to forego free choice between sellers.'" Abraham v. Intermountain Health Care, Inc., 461 F.3d 1249, 1264 (10th Cir. 2006) (alteration in original) (quoting Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 834 (7th Cir. 1978)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 31 (2006).

i. Separate Tying and Tied Products

"[T]he test for determining whether two components are separate products turns not on their function, but on the nature of any consumer demand for them." Multistate Legal Studies, Inc., 63 F.3d at 1547. "For two items at issue to be considered distinct products,

'there must be sufficient consumer demand so that it is efficient for a firm to provide [one] separate from [the other].'" Id. (quoting Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462 (1992)).  "'The courts uniformly consider the issue whether the tying arrangement consists of separate tying and tied products to be common to all members of the class.'" In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 87 (E.D.N.Y. 2000) (quoting Herbert Hovenkamp, Tying Arrangements and Class Actions, 36 Vand. L. Rev. 213, 220 (1983)).

Plaintiffs define the tying product as premium cable, or Advanced TV, and the tied product as the basic set-top boxes.  Plaintiffs use "premium cable" as a label for digital offerings by MVPDs that provide interactive programming, which, Plaintiffs argue, is defined in light of the complained-of conduct.[6]  This definition includes "the option to enjoy the interactive channel guide" or VOD, but not the actual downloaded movies or content. (Hr'g Tr. 32.)  Plaintiffs' definition is not determined by the Paks or variations thereof to which customers may have subscribed.  (Pls.' Br., Dkt. No. 160 Exs. 7-9.)  Rather, these are additional features that are marginal to the Plaintiffs' understanding of premium cable. Plaintiffs define the tied product as the basic set-top box that allows the customer to access Cox's IPG and VOD, regardless of the additional features of the set-top box such as the HD and DVR features.  (Id. at 19-20 & n.5.)  Defendant asserts that "premium cable" is a term

---

[6]  Plaintiffs also include the channels available through basic cable as an inframarginal feature, or a feature that you must subscribe to in order to subscribe to premium cable.  (Hr'g Tr. 31, 112 (stating that subscribers to only basic cable would not be included in the class).)

entirely of Plaintiffs' invention and that the services actually offered by Cox are too varied to operate under one label. Plaintiffs admit that Cox does not offer a service labeled "premium cable," but dispute that this lack of recognition impacts the use of premium cable as a label, or shorthand, for the tying product for litigation purposes.

Plaintiffs offer the following evidence to establish that these products are separate: Defendant's expert's, Michelle Burtis, statement that the set-top box and premium cable are separate products;[7] evidence of separate marketing, sales, and pricing of these products; and Cox materials reflecting the same. (Pls.' Br., Dkt. No. 160 Exs. 7, 16, 17 ("Q. Is there any circumstances under which you would say that a set-top box and Advanced TV are not separate products? A. I think they are separate products.").) Accordingly, while Defendant may disagree with Plaintiffs' conclusions, Plaintiffs have shown that the determination of whether the tied and tying products are separate can be established with common evidence.

## ii. Condition or Coercion

Often, coercion is one of the determinative elements in evaluating whether common evidence predominates in tying claims. When the alleged restraint is in a written agreement, such as a contractual provision requiring purchase of the tied product, many courts have found that common proof predominated and class certification was appropriate. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 452 (1977); In re Visa Check, 192 F.R.D. at 88

---

[7] At the class certification hearing, Dr. Burtis testified that she did not intend to concede that premium cable and set-top boxes were separate products. (Hr'g Tr. 158.) This clarification does not influence the Court's decision for present purposes that common evidence could establish whether these products are separate.

("[I]n cases such as this one, in which the alleged tie is the product of an undisputed contractual provision, the 'requisite coercion' is established."); see <u>George Lussier Enters., Inc. v. Subaru of New England, Inc.</u>, No. Civ. 99-109-B, 2001 WL 920060, at *11-12 (D. N.H. Aug. 3, 2001).  Likewise, when no contract exists and common proof of coercion was lacking, many courts have found that coercion must be shown on an individual basis rendering class certification inappropriate. <u>Hewitt v. Joyce Beverages of Wis., Inc.</u>, 721 F.2d 625, 628-29 & nn.2-3 (7th Cir. 1983); <u>Abrams v. Interco Inc.</u>, 719 F.2d 23 (2d Cir. 1983); <u>Ungar v. Dunkin' Donuts of Am., Inc.</u>, 531 F.2d 1211, 1226 & n.17 (3d Cir. 1976).

Plaintiffs do not claim that Cox contractually ties the products.  Rather, Plaintiffs allege that Cox degrades the quality of the tying product—by limiting the customer's access to Cox's interactive features—for customers who choose not to purchase the tied product, rent a Cox set-top box.  (Pls.' Br., Dkt. No. 160 at 24.) Therefore, Plaintiffs assert, Cox is forcing, or coercing, customers to comply with the tie and purchase the tied product from only Cox.  Plaintiffs contend that Cox imposes a penalty price on the stand-alone tying product, premium cable, by degrading service if the customer chooses not to purchase the tied product.  (Id.)  As support for this argument, Plaintiffs rely on their expert, Dr. Singer, who concluded that Cox's imposition of this penalty price has the practical economic effect of forcing Cox customers to rent a Cox set-top box.[8]  (Id. Ex. 13.)  Plaintiffs argue that Cox

---

[8]  Dr. Singer relies on a method called revealed preferences to reach his conclusion that customers rent a set-top box to gain access to its interactive features and not its other features, such as the clock and outlet jacks, due to the low replacement costs of those features. (Pls.' Br., Dkt. No. 209, at 13-14, Ex. 8, at 33-35; Hr'g Tr. 103 ("That [Ms. Coughlin] was willing to incur an additional $3.25 per month to get into the interactive realm is—reveals that she values the option to make use

customers were coerced, even if they would have rented from Cox absent the tie, because the customer's choices were altered through Cox's requirement.  (Hr'g Tr. 55.)  Additionally, Plaintiffs offer statistics of the number of Cox customers that complied with the tie, roughly 99% of Cox customers, as indirect evidence of coercion.  (Hr'g Tr. 42.)

Defendant argues that because no written contract exists requiring the purchase of the tied product, individualized proof is necessary to prove coercion in this case.  (Def.'s Br., Dkt. No. 181, at 23-24.)  Defendant contends that in a practical effects tying case, coercion can only be established by deposing each class member to discern whether each was forced to rent a Cox set-top box.[9]  As support for its conclusion that coercion can only be proven with individualized proof, Defendant cites Freeland, 238 F.R.D. 130, where the district court found class certification of the plaintiffs' tying claim improper.  Here, however, unlike the defendant in Freeland, Defendant states that it required rental of a Cox set-top box in order to receive full access to all interactive digital features, and Plaintiffs point to Cox material stating as much as evidence of coercion.  Freeland, 238 F.R.D. at 154 (describing that coercion is subject to generalized proof in two circumstances:  (1) when the policy of

_____

of those features.  Whether she ever made use of the features in actuality is a different method[ that] . . . is not very relevant to my analysis.").)  Defendant's expert disagrees with this conclusion and argues that the only way to determine which features the customer preferred is by conducting individual evaluations.  (Def.'s Br., Dkt. No 247, at 4-5, Ex. 2, at 4-5.)

[9]   Defendant cites Ungar for the proposition that "[e]stablishing that buyers purchase products A and B from the seller does not establish that the seller ties the sale of product A to the purchase of product B.  It merely establishes that buyers purchase products A and B from the seller." Ungar, 531 F.2d at 1225.  While that may be true, here, Plaintiffs proffer common evidence that Cox allegedly provides a degraded product A when customers did not also purchase product B, which is a different scenario.

conditioned sales is admitted to by the defendant; and (2) when a contractual provision requiring the tie applies to all members of the class); see also Hill v. A-T-O, Inc., 535 F.2d 1349, 1355 (2d Cir. 1976) (describing the defendants' admission "to a policy of never offering the FBP buying plan membership separately from the sale of the Compact cleaner"). (Def.'s Br., Dkt. No. 181, at 26.)

While there is no contractual provision requiring that Cox customers rent a Cox set-top box, there is direct, common evidence of classwide policies, practices, and statements that Cox customers had to rent a Cox set-top box in order to participate in the full panoply of digital services.[10]  Cox stated on its website and other material that "[i]n order to receive interactive TV services offered by Cox, such as IPG, PPV, and all advanced TV programming options, you must rent a digital receiver."  (Def.'s Br., Dkt. No. 181 Ex. 26; Pls.' Br., Dkt. No. 160 Ex. 13, 18, 19 (stating that "[i]n order to receive Interactive TV services offered by Cox, such as the Interactive Programming Guide, On Demand, and Pay-Per-View, and all programming options, you must rent a [Cox set-top box]").)  This

---

[10] Chase Parkway Garage, Inc. v. Subaru of New England, Inc., 94 F.R.D. 330, 331-32 (D. Mass. 1982) (agreeing with the Third Circuit's analysis in Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977), "that proof of coercion on an individual basis was not required where a seller expressly conditioned the sale of one product upon the purchase of another"); Ungar, 531 F.2d at 1222, 1226 & n.17 ("With regard to the doctrine of individual coercion we believe it is open to us to reject it, as the district court did, or to accept it.  Having in mind the particular factual complex before us, we choose the latter course. . . .  Where, as here, plaintiff franchisees place no reliance on express contractual tie-ins, each, individually, must prove that his purchases were coerced as an element of establishing a prima facie case of illegal tying.").

requirement was constant across Cox's national footprint and advertised nationally.[11]  See Freeland, 238 F.R.D. at 154 ("Because the ultimate question is whether the purchase of the tying product was in fact conditioned on the purchase of the unwanted tied product, '[a]n unremitting policy of tie-in' will constitute coercion." (quoting Hill, 535 F.2d at 1355)); see also Martino v. McDonald's Sys., Inc., 81 F.R.D. 81, 88-89 (N.D. Ill. 1979) (finding that conditioning could be shown on a class-wide basis when common evidence showed a "firm policy" of conditioning).  Accordingly, Plaintiffs have established that coercion is amenable to proof on a classwide basis.

### iii.  Market Power

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."  Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 46 (2006).  "Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.'"  Kodak, 504 U.S. at 464 (quoting Jefferson Parish, 466 U.S. at 14).  "It has been defined as 'the ability of a single seller to raise price and restrict output.'"  Id. (quoting Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 503 (1969); United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 391 (1956)).  Evaluation of the relevant market requires evidence of both a product market and geographic market.  Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1026 (10th Cir. 2002).

---

[11]  While Cox also stated that its customers were free to rent a CableCard or obtain another set-top box, it explicitly stated that customers who chose this path would be unable to access certain interactive programming.  (Def.'s Br., Dkt. No. 181 Exs. 25 & 26.)

"There is no subject in antitrust law more confusing than market definition. One reason is that the concept, even in the pristine formulation of economists, is deliberately an attempt to oversimplify—for working purposes—the very complex economic interactions between a number of differently situated buyers and sellers, each of whom in reality has different costs, needs, and substitutes . . . ."

Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124, 1131 (10th Cir. 2002) (quoting

SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 966 (10th Cir. 1994) (internal quotation

marks, citations, and alterations omitted in original)).

(a).  Product Market

The product market is defined by reference to the "reasonable interchangeability of

use or the cross-elasticity of demand between the product [in question] and substitutes for

it." Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 325 (1962); see also Telecor, 305

F.3d at 1131.  "'Interchangeability implies that one product is roughly equivalent to another

for the use to which it is put; while there may be some degree of preference for the one over

the other, either would work effectively.'" Queen City Pizza, Inc. v. Domino's Pizza, Inc.,

124 F.3d 430, 437 (3d Cir. 1997) (quoting Allen-Myland, Inc. v. Int'l Bus. Machs. Corp., 33

F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted in original)).  Factors to be

considered include price, use, and qualities.  Id. "'Cross-elasticity of demand is a measure

of the substitutability of products from the point of view of buyers.  More technically, it

measures the responsiveness of the demand for one product to changes in the price of a

different product." Id. (quoting E. Thomas Sullivan and Jeffrey L. Harrison, Understanding

Antitrust and its Economic Implications 217 (1994)).

Plaintiffs conclude that the relevant product market includes cable, satellite, and "telcos." (Pls.' Br., Dkt. No. 160, at 26.) As support for their definition of the relevant product market, Plaintiffs rely on the conclusion of their expert economist, Dr. Singer, who defined the market by using FCC pricing reports, product-feature comparisons, and market-structure analyses. While Dr. Singer concluded that satellite and telco providers' digital offerings do not offer the same level of product as cable digital providers,[12] he nevertheless included them in his product market definition to be conservative. (Pls.' Br., Dkt. No. 190, at 17.)

Plaintiffs and Defendant disagree whether over-the-top providers, such as Netflix, should be included in the product market.[13] While Plaintiffs concede that Netflix, and similar online video distributors, offers one aspect of premium cable comparable to VOD or PPV, Plaintiffs conclude that it is not a competitor with premium cable because it lacks critical components of premium cable, the interactive guide and live programming. (Pls.' Br., Dkt. No. 160 Ex .13, at 78; at 60-61.) Online video distributors do not provide the feature that is implicated by Cox's complained-of conduct which is "central to the definition of the relevant tying product market." (Id. Ex. 13 at 78). Nor do they offer the premium channels. (Id. at 79.) Therefore, Dr. Singer was "not convinced that at least in this case, with respect to the

---

[12] Dr. Singer concludes that DBS providers are not true competitors of premium cable because "DBS often has weaker two-way service than other forms of MVPD." (Dkt. No. 160, Ex. 13 at 77.)

[13] Over-the-top providers do not have their own infrastructure. Rather, these services ride over the top of another entity's infrastructure, such as a broadband or high-speed Internet infrastructure. (Hr'g Tr. 60.)

set of services that are being withheld here [by Cox], that Netflix represents a -- close substitute for customers to turn, when Cox degrades their two-way interactive services." (Pls.' Br., Dkt. No. 209 Ex. 8, at 68.)

Plaintiffs argue that Defendant's attempts to insert the consumer's subjective perception of what is "reasonably interchangeable" with premium cable are in error. Rather, Plaintiffs argue, this test is determined utilizing cross-elasticity of demand, not individual consumer's purchasing preferences. Defendant contends that Plaintiffs' description of the tying product as premium cable and the tied product as set-top boxes ignores the various cable packages available. Because of this variance, Defendant argues, the relevant product market definition cannot be proven with evidence common to the class.

Rather, Defendant argues that in order to determine the appropriate product market, consumers' different interests must be considered. (Def.'s Br., Dkt. No. 181, at 38.) Specifically, Defendant points to the difference between named Plaintiff Barksdale Hortenstine, who has a great interest in movies and VOD, and named Plaintiff Sharon Coughlin, who has no interest in VOD. (Id. at 39.) Such an in-depth review of individual consumer's preferences is not necessary to determine the relevant product market. In re Live Concert Antitrust Litig., 247 F.R.D. 98, 127 (C.D. Cal. 2007) (stating that "the 'least reliable' evidence in predicting the effects of a hypothetical price increase is ""'subjective'"" testimony by customers that they would or would not defect in response to a given price increase.'" (quoting Areeda & Hovenkamp, Antitrust Law ¶ 538b)). "[W]hen calculating the cross-elasticity of demand, economists examine the aggregate demand of consumers as

represented by a demand curve rather than the purchasing decisions of an individual consumer." Id. For present purposes, it is enough that evidence common to the class will define the relevant product market.

(b). Geographic Market in Tying Product

"The geographic market is '"the narrowest market which is wide enough so that products from adjacent areas . . . cannot compete on substantial parity with those included in the market."'" Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1222 (10th Cir. 1986). The geographic market consists of the area of effective competition, and defining the relevant market is an issue of fact. Telecor, 305 F.3d at 1131. "The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of demand.'" Kodak, 504 U.S. at 469. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 893 (10th Cir. 1991).

"The size of the relevant geographic market depends on a number of factors, including '[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors.'" Lantec, 306 F.3d at 1027 (quoting T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 823 (11th Cir. 1991). "In other words, 'the outer boundary of the relevant product market is reached, if one were to raise the price of the product or limit its volume of production, while demand held constant, and supply from other sources beyond the boundary could not be expected to enter promptly enough and in large

enough quantities to restore the old price or volume.'" <u>Westman</u>, 796 F.2d at 1222 (<u>quoting</u>

<u>Satellite Television & Associated Res., Inc. v. Continental Cablevision of Va., Inc.</u>, 714 F.2d

351, 356 (4th Cir. 1983)).

Plaintiffs contend that the relevant geographic market is Cox's national footprint,

which includes portions of Arizona, Arkansas, California, Connecticut, Florida, Georgia,

Idaho, Iowa, Kansas, Louisiana, Massachusetts, Missouri, Nebraska, Nevada, North

Carolina, Ohio, Oklahoma, Rhode Island, and Virginia.  (Pls.' Am. Compl., Dkt. No. 17,

¶¶ 102-03.)[14]  Plaintiffs also state in passing that an alternative market to the national one

could be each local area individually.[15]

---

[14] In their First Amended Complaint, Plaintiffs state that "[t]he relevant geographic market is the area in which Cox provides Premium Cable. . . . Those areas are certain communities in: Arizona, Arkansas, California, Connecticut, Florida, Georgia, Iowa, Idaho, Kansas, Louisiana, Nebraska, Nevada, Ohio, Oklahoma, Rhode Island, and Virginia."  (Amend. Compl., Dkt. No. 17, at 20.)

[15] Defendant claims that Plaintiffs have not raised individual markets as possible geographic markets.  (Def.'s Br., Dkt. No. 181, at 36.)  While Plaintiffs have stated that they seek certification based on numerous geographic subclasses, they have not supported this request with appropriate discussion.  (Amend. Compl. Dkt. No. 17, at 21 ("In the alternative, each of the local areas in which Cox operates is a relevant geographic market.").  In Plaintiffs' Motion to Certify the Class, they note that they "believe that one class that covers Cox's footprint is both the proper class to be certified and the most convenient.  However, should the Court certify numerous classes that correspond to each of Cox's local markets, Plaintiffs respectfully request the opportunity to add class representatives who reside in those markets in which Plaintiffs have not yet named a class representative." (Pls.' Br., Dkt. No. 160, at 31 n.9.)  While Plaintiffs have stated in passing that the appropriate geographic market could be regional markets, they have not fleshed out this argument in the briefs sufficiently to establish that Rule 23 is satisfied as to each region, and the Court will not now undertake that responsibility itself.  This, however, does not determine whether class actions would be appropriate at the regional market level.  For present purposes, the Court only determines the market fully briefed:  the national market.

Defendant argues that due to the vast differences of competitors amongst the local markets, a national market is inappropriate.  Defendant cites to and relies upon a Second Circuit case, <u>Heerwagen v. Clear Channel Communications</u>, 435 F.3d 219 (2d Cir. 2006), <u>overruled on other grounds by</u> <u>Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.</u>, 546 F.3d 196, 200 (2d Cir. 2008), as support for its argument that the relevant geographic market is local, not national, despite Cox's nationally coordinated conduct.[16]  Defendant contends that Plaintiffs' market analysis is divorced from a proper geographic market because it ignores the competitive variations amongst local cable markets.

As support for their conclusion that the relevant geographic market is national, not local, Plaintiffs rely heavily on Cox's nationally-coordinated conduct relating to its set-top box policies.  (Pls.' Br., Dkt. No. 160, at 28, Exs. 26, 28, 29.)  Similar to the plaintiffs in <u>Heerwagen</u>, Plaintiffs argue that the Supreme Court's decision in <u>United States v. Grinnell Corp.</u>, 384 U.S. 563 (1966), supports finding a national market and certifying the class.

In <u>Grinnell</u>, the Supreme Court found that the relevant geographic market for central service stations was national—despite service stations' limited service area of 25 miles—due

---

[16]  In <u>Heerwagen</u>, the Second Circuit upheld the district court's finding that a putative class of concert ticket buyers should not be certified because the defendant lacked "the power to control prices and exclude competition nationally."  <u>Id.</u> at 224-25, 229 ("In light of the substantial non-common issues regarding market power, and because we review the district court's factual determination as to the bounds of the relevant geographic market for clear error, it was not error for the district court to conclude that individualized questions would predominate." (citations omitted)).  Specifically, the Second Circuit upheld the district court's conclusion that the defendant's national conduct—namely, nationally coordinating concert tours—was not enough to establish that common issues would predominate under Rule 23(b)(3) when the relevant geographic market for concert tickets was local.  <u>Id.</u> at 229.

to the defendant's national conduct, which included utilizing national agreements, nationally scheduling prices, rates, and terms, certification by national insurers, and nationwide contracting.  Grinnell, 384 U.S. at 575-76.  Plaintiffs state that evidence of Defendant's statements regarding and determination of its market power,[17] national decision-making regarding set-top box manufacturing and policy,[18] and churn rates are common to the class and support a finding that the relevant geographic market is Cox's national footprint.

Plaintiffs acknowledge that local markets vary regarding competitors, but argue that limiting the market is nonsensical in light of the complained-of conduct, which is based on nationally coordinated conduct.  While the different markets may have slight variations of competitors, Plaintiffs argue, the competitive alternatives are not so varied as to prevent aggregating the local markets into a national footprint.  But see Grinnell, 384 U.S. at 574 (finding that no substitute service rose to "the same level as the central station service so as to meet the interchangeability test . . . .").

Basically, Plaintiffs assert, Cox customers face two rivals regardless of the local market in which they live:  two direct broadcasting rivals, DirecTV and DISH Network. (Hr'g Tr. 58.)  Dr. Singer stated that there was "no economic" reason why the relevant

---

[17] Cox's own upper management admits to having pricing power in its investor documents. Pat Esser, President of Cox, stated in a 2006 overview that "[w]e believe we have Pricing Power[;] We have record low churn rates[;] . . . We have majority share in video and HSI."  (Pls.' Hr'g Ex. H.)

[18] Cox's national headquarters selected the manufacturer of the set-top box, the features of the set-top box, and determined the range of rates charged for the set-top box, with final approval over lease rates.  (Pls.' Br., Dkt. No. 160 Ex. 42 at 11-12; Hr'g Tr. 302.)

geographic market could not be national if the same competitive conditions existed in every market. (Pls.' Br., Dkt. No. 160 Ex. 13, at 86-87.) Despite agreeing that the competitive conditions in the markets vary—an additional 14% of Cox customers also have access to telco overbuilders, such as AT&T or Verizon—Dr. Singer concludes that such variations are not significant enough to affect Cox's market power. (Id.) But such a determination would require an evaluation of the actual competitive conditions of the market locally, not nationally.

Essentially, Plaintiffs ask the Court to ignore the economic reality that Cox customers face different options depending on where they live and that most customers will not relocate their homes in order to change their options for MVPD services.[19] Heerwagen, 435 F.3d at

---

[19]   See In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses, 21 FCC Rcd. 8203, 8235-36 (July 21, 2006) ("In the past, the Commission has concluded that the relevant geographic market for MVPD services is local because consumers make decisions based on the MVPD choices available to them at their residences and are unlikely to change residences to avoid a small but significant increase in the price of MVPD service. In order to simplify the analysis, the Commission has aggregated consumers that face the same choice in MVPD products into larger relevant geographic markets. We find it appropriate to continue this approach here. Because the major MVPD competitors in most areas are the local cable operator and the two DBS providers, and consistent with the Commission's approach in prior license transfer proceedings, we find that the franchise area of the local cable operator is the relevant geographic market for purposes of this analysis.") (footnotes omitted). Competitive Impact Statement, United States v. Comcast Corp., et al., No. 1:11-cv-00106, at 13 (D. D.C. Jan. 18, 2011) ("A consumer purchasing video programming distribution services selects from those distributors offering such services directly to that consumer's home. . . . A consumer cannot purchase video programming distribution services from a wireline distributor operating outside its area because that firm does not have the facilities to reach the consumer's home. Consequently, although the set of video programming distributors able to offer service to individual consumers' residences generally is the same within each local community, that set differs from one local community to another and can even vary within a local community. The markets for video programming distribution therefore are local."). See also In re Set-Top Cable Television Box Antitrust Litig., Nos. 08-MD-1995 & 08-CIV-7616(PKC), 2011 WL 1432036, at *13 (S.D.N.Y. Apr. 08, 2011); Behrend v. Comcast Corp., 655 F.3d 182, 192 (3d Cir. 2011); (Def.'s Br., Dkt. No. 181, at 13-17, 30 n.68 (describing the various

228 ("In certain service industries, the geographic market may be confined by the fact that it can be impractical for consumers to travel great distances to procure particular services."). Cox's national conduct regarding set-top boxes does not convert a local geographic market into a national one, and the determination of Cox's market power should not be divorced from the appropriate geographic market.  See TV Commc'ns Network, 964 F.2d at 1027 (holding a 15 U.S.C. § 1 unreasonable restraint of trade claim requires proof "the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market"); Lantec, 306 F.3d at 1026 (stating that "proof of relevant market requires evidence of both a product market and a geographic market").

        While the Second Circuit in Heerwagen read the Grinnell decision as "stand[ing] for the proposition that in some cases involving services that tend to be provided locally, the market for purposes of antitrust law still could be national," this is not such a case.  The determination of which competitors Cox faced in each geographic region cannot be proven with evidence common to a national class.[20]  Behrend v. Comcast Corp., 655 F.3d 182, 192 (3d Cir. 2011) ("Defining the relevant geographic market . . . is an issue of the merits").  Nor can the competitive market be easily divided into two categories given the varying regional competitors and options available to class members.  (See Def.'s Br., Dkt. No. 181 at 13-17,

---

competitors Cox faces in different regions).)

        [20] Plaintiffs' expert attempts to explain away variances in the market by citing an FCC report suggesting that telcos do not constrain cable providers' prices.  (Hr'g Tr. 285; Def.'s Br., Dkt. No. 181 Ex. 22 ¶ 85.)  While Dr. Singer agreed that telcos initially affected cable pricing, he concludes that their impact now has little or no affect on cable pricing.  (Hr'g Tr. 288-89.)  See infra note 24.

30 n.68 (describing the various competitors in different regions.)  At the class certification stage, a court need only be satisfied that issues—including the definition of a geographic market—will be capable of proof through evidence common to the class, which has not been established here.  Accordingly, the determination of Cox's market power is not amenable to proof on a classwide basis.

### iv.  Substantial Amount of Commerce

Finally, Plaintiffs must show that a substantial amount of commerce in the tied product is involved, which is evaluated in terms of dollar volume, not market percentage. Jefferson Parish, 466 U.S. at 16;  Tic-X-Press, Inc. v. Omni Promotions Co. of Ga., 815 F.2d 1407, 1419 (11th Cir. 1987).  This element was found more than satisfied when the dollar amount of commerce foreclosed by the tie was over two million dollars, with the dollar amount being measured by all sales subject to the tie, not just by the plaintiff's purchases. Fortner, 394 U.S. at 501-02.  Here, Plaintiffs proffer evidence common to the class that since 2006, Cox received at least 250 million dollars' worth of revenue in set-top box leases per year.  (Pls.' Br., Dkt. No. 160 Ex. 42, at 12.)  Accordingly, whether Cox conducted a substantial amount of interstate commerce in the set-top box market can be proven with common evidence.

b.  Antitrust Injury or Impact

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125 (1969)).  "Plaintiffs seeking class certification may carry their burden of establishing that injury is subject to generalized proof by submitting an expert report that 'posits class-wide injury resulting from every single class member's overpaying for [a tied product] as a direct result of the tie.'"  Freeland, 238 F.R.D. at 143 (citation omitted and alteration in original) (quoting Visa Check, 280 F.3d at 137); Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 302 (5th Cir. 2003) ("[W]e have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.").  All that must be shown at this stage in the proceeding is that injury is capable of proof through common evidence, which is distinguishable from actually calculating the amount of damages.

Plaintiffs allege that they suffered an antitrust impact by paying supracompetitive prices for the tied product, an overcharge imposed by Cox on set-top box rentals.  Plaintiffs' expert, Dr. Singer, proposes the GRS Test—which "seeks to estimate the price effects of a particular vertical restraint, in this case, a bundled rebate or a tie-in"—as a method of

evaluating the alleged tie's impact on Cox customers and a calculation of aggregate damages.[21]  As an additional method of calculating aggregate damages, Dr. Singer proposes the Benchmark Method, which compares the prices that Canadian cable companies charge for set-top boxes with Cox's prices.  (Pls.' Br., Dkt. No. 160, at 37; Hr'g Tr. 74.)  The GRS Test seeks to distinguish procompetitive bundles from anticompetitive bundles, from a consumer-welfare focus.  (Hr'g Tr. 75.)  Utilizing this methodology, Dr. Singer concluded that Cox's bundle of premium cable and set-top box rental was anticompetitive and that Cox customers were overcharged for the set-top boxes they rented.  (Pls.' Br., Dkt. No. 160, at 37.)

At the recent hearing, the parties' respective expert economists debated at length the appropriateness of applying the GRS Test in this case.  Prior to the Supreme Court's decision in Wal-Mart, Stores, Inc. v. Dukes, ___ U.S. ___, 131 S. Ct. 2541 (2011), the Court would have left Dr. Burtis's critiques of Dr. Singer's application of this method for resolution at the Daubert[22] motion stage.  However, the Supreme Court recently suggested in dicta that Daubert applied to expert testimony at the class certification stage.[23]  Id. at 2553-54 ("The

---

[21]  GRS is an acronym of the method's creators' last names, Patrick Greenlee, David Reitman, and Davis S. Sibley, who began a working paper in 2004 and ultimately published their method in 2008.  Patrick Greenlee, David Reitman & Davis S. Sibley, An Antitrust Analysis of Bundled Loyalty Discounts, 26 Int'l J. Indus. Org. 1132, 1132 (2008).

[22]  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

[23]  Cf. In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 627 (8th Cir. 2011) (applying a focused Daubert analysis), pet. for cert. filed, No. 11-740 (Dec. 15, 2011); Fosmire v. Progressive Max Ins., Co., ___ F.R.D. ___, 2011 WL 4801915 (W.D. Wash. Oct. 11, 2011) (applying the more focused Daubert inquiry delineated in Zurn at the class certification stage).  See

District Court concluded that <u>Daubert</u> did not apply to expert testimony at the certification

stage of class-

action proceedings.  We doubt this is so . . . .") (citation omitted).  Therefore, the Court will

evaluate Dr. Singer's use of the GRS Test in light of the requirements outlined in <u>Daubert</u>

and its progeny.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Courts function as gatekeepers to ensure that all expert testimony admitted at trial is both

relevant and reliable.  <u>Dodge v. Cotter Corp.</u>, 328 F.3d 1212, 1221 (10th Cir. 2003).  The

proponent of an expert bears the burden of demonstrating that the requisite admissibility

requirements are met by a preponderance of the evidence.  Fed. R. Evid. 702 advisory

committee's note.

---

also <u>Smith v. Ceva Logistics U.S., Inc.</u>, No. CV 09-4957 CAS (RCx), 2011 WL 3204682, at *7-8 (C.D. Cal. July 25, 2011) (discussing impact of <u>Wal-Mart</u> on <u>Daubert</u> analysis at class-certification stage); <u>In re Taco Bell Wage & Hour Actions</u>, No. 1:07-cv-01314-OWW-DLB, 2011 WL 4479730, (E.D. Cal. Sept. 26, 2011) (same); <u>In re Aftermarket Auto. Lighting Prods. Antitrust Litig.</u>, 276 F.R.D. 364, 370 (C.D. Cal. 2011) (same). December 27, 2011

This gatekeeping role necessitates a two-part inquiry.  Norris v. Baxter Healthcare Corp., 397 F.3d 878, 883 (10th Cir. 2005).  First, courts must "'determine if the expert's proffered testimony . . . has "a reliable basis in the knowledge and experience of his discipline."'"  Id. at 883-84 (quoting Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)).  At this stage of the analysis, courts must conduct a preliminary inquiry into the expert's qualifications and the admissibility of the proffered evidence.  Bitler, 391 F.3d at 1120.  This entails an examination of "'whether the reasoning or methodology underlying the testimony is scientifically valid.'"  Id. (quoting Daubert, 509 U.S. at 592-93).  Second, courts must "inquire into whether proposed testimony is sufficiently 'relevant to the task at hand.'"  Norris, 397 F.3d at 884 (quoting Daubert, 509 U.S. at 597).  Here, courts examine whether the proposed testimony is logically related to a material issue and whether it would aid the trier of fact.  Id. at n.2; Bitler, 391 F.3d at 1121.  To assess the reliability of proffered expert testimony, courts should consider, among others, the following factors:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

Dodge, 328 F.3d at 1222.  Rather than assessing the reliability of an expert's conclusions, courts should instead focus on the methodology and reasoning employed.  Id.  The Court's function as gatekeeper does not replace the adversary system, and "the rejection of expert

testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note.

Dr. Singer is a well-qualified economist, which Defendant does not dispute.[24]  The GRS Test estimates the overcharge Cox customers paid on set-top boxes by determining the difference between the actual price paid by Cox customers and the price Cox customers would have paid absent the alleged tie, in the but-for world.  (Pls.' Br. Dkt. No. 160 Ex. 13, at 63.)  The proposed aggregate damages are the overcharge times the number of set-top boxes rented.  (Id.)

Defendant argues that this test was created for use when a monopolist bundles rebates and that application of the GRS Test is only appropriate when the subject firm is a monopolist, which Cox is not.  (Def.'s Br., Dkt. No. 181, at 61.)  Plaintiffs counter that the GRS Test can be utilized when the subject firm faces a downward sloping demand curve for the tying product and the purchaser purchases multiple units of the tying product.  (Pls.' Br., Dkt. No. 209, at 31-32.)  Whether this test can be utilized in tying cases, and under what conditions, is an open question.  See Patrick Greenlee, David Reitman & Davis S. Sibley, An Antitrust Analysis of Bundled Loyalty Discounts, 26 Int'l J. Indus. Econ. 1132, 1132 (2008) (finding that it is an "open question" whether their test applies in tying cases).  While the test may be new, it was promulgated by serious economists who are experts in their field, peer

---

[24]  Dr. Singer obtained his Ph.D. in Economics from Johns Hopkins University, teaches at Georgetown University, and he has been extensively published in his field.  (Pls.' Br., Dkt. No. 160 Ex. 13, at 132-40.)

reviewed, published and discussed in economic literature,[25] and previously used in other litigation.[26]  These discussions, however, were in the context of a monopoly, which is not present here.  Whether Dr. Singer's application of the GRS Test satisfies the requirements of <u>Daubert</u> is not easily resolved.  However, because application of the GRS Test cannot be based on evidence common to the class, resolution at this point is unnecessary.

Whether the GRS Test can be utilized with common evidence is a separate issue.  To implement this method, Dr. Singer relied on Cox's data on cable costs, academic estimates of elasticities of demand for premium cable service, and the Lerner equation to estimate the but-for price of premium cable.  (Pls.' Br., Dkt. No. 160 Ex. 13 at 117.)  The two elasticities of demand upon which Dr. Singer relies are not Cox specific and were estimated in academic writings in 2001 and 2004 respectively.  (<u>Id.</u> Ex. 13, at 118 & nn. 329-30 (<u>citing</u> Tasneem

---

[25]  Patrick Greenlee, David Reitman & Davis S. Sibley, <u>An Antitrust Analysis of Bundled Loyalty Discounts</u>, 26 Int'l J. Indus. Org. 1132 (2008); Timothy J. Muris & Vernon L. Smith, <u>Antitrust and Bundled Discounts:  An Experimental Analysis</u>, 75 Antitrust L.J. 399 (2008); Patrick Greenlee, David Reitman & David S. Sibley, <u>Comment on Muris and Smith, "Antitrust and Bundled Discounts:  An Experimental Analysis</u>," 77 Antitrust L.J. 669 (2011) (responding to Muris and Smith's critique of the GRS Test); Timothy J. Muris et al., <u>Antitrust and Bundled Discounts:  An Experimental Analysis—A Reply</u>, 77 Antitrust L.J. 683 (2011) (responding to Greenlee, Reitman, and Sibley's response).

[26]  Dr. Singer previously applied the GRS Test in a § 2 monopoly case involving the sale of antiviral drugs. <u>Meijer, Inc. v. Abbott Labs.</u>, No. C 07-5985 CW, 2008 WL 4065839, at *1, (N.D. Cal. Aug. 27, 2008). In granting the class certification motion, the court determined that "Plaintiffs intend[ed] to prove the fact of injury to the class by evidence that [was] predominately generalized. In addition, Dr. Singer's conclusion that class members paid more, not the same or less, for at least some purchases of Norvir and Kaletra following Abbott's price increases, [was] eminently plausible."  <u>Id.</u> at *9.  Whether the court relied upon Dr. Singer's application of the GRS Test specifically is not known, since the court does not explicitly reference the GRS Test and Dr. Singer proffered other elements to determine proof of impact. (Hr'g Tr. 284 ("Q.  So did your expert report in the Norvir case contain any other proof of impact other than the GRS test?  A.  There might have been other elements to it . . . .").)

Chipty, <u>Vertical Integration, Market Foreclosure, and Consumer Welfare in the Cable Television Industry</u>, 91 Am. Econ. Rev. 428 (2001), <u>and</u> Austan Goolsbee & Amil Petrin, <u>The Consumer Gains from Direct Broadcast Satellites and the Competition with Cable TV</u>, 72 Econometrica 351 (2004)); Hr'g Tr. 134.)

Defendant argues that the elasticity of demand varies in different parts of the country and requires individualized market data to prove, not common evidence.  (Hr'g Tr. 134-35.) And Plaintiffs' expert agreed.[27]  (<u>Id.</u>)  Because the elasticity of demand depends on the extent of competition in the market, which varies regionally, application of this factor in the GRS Test would not be conducive to evidence common to the class.

Plaintiffs expert also proffers another method for calculating aggregate damages, called the Benchmark method, where he compares rental rates of set-top boxes in the United States to rates in Canada.  (Pls.' Br., Dkt. No. 209, at 37-38.)  Defendant contends that this method is inappropriate given Dr. Singer's failure to evaluate the different Canadian and American regulations and the different costs of Canadian and American cable providers. (Def.'s Br., Dkt. No. 181, at 66-67.)  In light of the failure to consider the differences

---

[27]  At the class certification hearing on redirect, Plaintiffs' expert attempted to minimize the impact of this by stating that "in the worst-case scenario, at most [he] could envision two implementations of the GRS test," one for markets with telcos and another for markets without telcos.  (Hr'g Tr. 278.)  Plaintiffs' insistence that such variations can be glossed over for present purposes is unpersuasive given that the determination of telcos' impact on cable pricing must be made regionally.  As support for his conclusion that telcos do not impact cable pricing, Dr. Singer cites a 2011 FCC report.  (<u>Id.</u>)  FCC reports, however, calculate impact with pricing data provided by cable operators at rate card prices, not limited term prices, which vary regionally and temporally. (Hr'g Tr. 291-92.)  Accordingly, determining the impact of telcos on cable pricing would require regional analysis.

regarding regulations and costs imposed on Canadian and American cable providers, the

application of the Benchmark method rests on unstable ground.  However, due to the lack

of common evidence regarding Plaintiffs' proffered method of determining injury, whether

this method satisfies <u>Daubert</u> need not presently be determined.  Additionally, different

geographic regions are subject to different levels of pricing regulation by the FCC, which

Defendant intends to raise as a defense against Plaintiffs' claims, and which requires further

inquiry that cannot be established with common evidence.[28]

 While doubts regarding whether certification is appropriate should be resolved in

favor of certification, before named Plaintiffs may proceed as a class, they must show that

---

[28] Defendant asserts that Plaintiffs' claims are barred, in whole or in part, because the complained-of conduct is regulated by the FCC.  <u>Crumley v. Time Warner Cable</u>, 556 F.3d 879 (8th Cir. 2009); <u>see</u> <u>Coll v. First Am. Title Ins. Co.</u>, 642 F.3d 876, 890 (10th Cir. 2011) ("'[T]he focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations.'  The dispositive question, then, is whether, if plaintiffs succeed on their damages claims, the court's determination will impact the agency's rate determinations.  If so, the 'filed rate' doctrine will bar the claim." (quoting <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 954 F.2d 485, 489 (8th Cir. 1992))).  Pursuant to FCC Form 1205, set-top box prices are regulated in communities where "cable systems . . . are not subject to such effective competition." 47 U.S.C. § 543(b)(3); 47 C.F.R. §§ 76.905(a), 76.910, 76.933.

 Plaintiffs contend that this defense is not applicable because the complained-of conduct is tying, not overcharging on set-top box rentals.  (Pls.' Br., Dkt. No. 209, at 38-39.)  But Defendant raises this defense regarding Plaintiffs' alleged antitrust impact.  (Def.'s Br., Dkt. No. 181, at 49.)  And Plaintiffs admit that if valid, determination of whether class members lived in regulated or nonregulated areas, or if any class member moved between the two during the relevant time period, would need to be made.  (Pls.' Br., Dkt. No. 209, at 41 ("In the unlikely event that a class member moved to an unregulated area during the class period, then damages would be allowed only for the time that he or she leased a STB in an unregulated area.  The only information relevant to this determination is the geographic location of the class members.").)  But this inquiry could not be done with evidence common to the class, individual determinations of who lived where during the relevant time period would be required.

Rule 23's requirements have in fact been satisfied.[29]  See Esplin v. Hirschi, 402 F.2d 94, 99 (10th Cir. 1968) (stating that "if there is to be an error made, let it be in favor and not against the maintenance of the class action").  Because market power and antitrust injury are not amenable to proof with common evidence, Plaintiffs have not met their burden of establishing that common issues predominate pursuant to Rule 23(b)(3).  Additionally, in light of the multiple regional analysis required to determine market power and impact, maintaining a class action on a national level would not be manageable.

## V.  CONCLUSION

Accordingly, the Court concludes that Plaintiffs have not met their burden of showing this case should proceed as a class action, and, therefore, Plaintiffs' Motion for Class Certification (Dkt. No. 160) is DENIED.

IT IS SO ORDERED this 28th day of December, 2011.

ROBIN J. CAUTHRON
United States District Judge

---

[29]  Despite Defendant's questioning whether this doctrine survived the recent Supreme Court's decision Wal-Mart v. Duke, ___ U.S. ___, 131 S. Ct. 2541 (2011), until otherwise informed, the Court still finds it relevant.  (Def.'s Br., Dkt. No. 181, at 23.)  See Lewis v. Alexander, 276 F.R.D. 421, ___, 2011 WL 3678721, at *25 (E.D. Pa. Aug. 22, 2011) (applying this doctrine post-Wal-Mart); Hershey v. ExxonMobil Oil Corp., No. 07-1300-JTM, 2011 WL 1234883, at *3-4 (D. Kan. Mar. 31, 2011) (finding this doctrine relevant three months prior to Wal-Mart); Clay v. Pelle, No. 10-cv-01840-WYD-BNB, 2011 WL 843920, at *1 (D. Colo. Mar. 08, 2011) (same).